## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

|  |  |
|---|---|
| EVERGREEN HEALTH COOPERATIVE INC.<br>3000 Falls Road #1<br>Baltimore, MD 21211<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT<br>OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>CENTERS FOR MEDICARE<br>AND MEDICAID SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>SYLVIA MATHEWS BURWELL<br>Secretary of the United States Department<br>of Health and Human Services, in her official capacity,<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>    and<br><br>ANDREW M. SLAVITT<br>Acting Administrator for the Centers for<br>Medicare and Medicaid Services, in his official capacity,<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 16-cv-2039<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

## I.      Introduction

1.      This action arises from the federal government's failure to comply with its statutory obligations in implementing the risk adjustment program of the Patient Protection and Affordable Care Act ("ACA"), Pub. Law No. 11-148, § 1343, 42 U.S.C. § 18063.

2.      Before the ACA, many Americans lacked access to health insurance coverage because of preexisting health conditions.  For many others, premiums were prohibitively expensive because rates varied based on an individual's health status, as well as age and other factors.  The ACA addressed these problems through the "guaranteed issue" and "community rating" provisions.  These provisions, which took effect on January 1, 2014,  prohibit insurance companies from denying coverage or setting premium rates based on medical history or health status.  ACA § 1201(2)(A), 42 U.S.C. §§ 300gg-1 – 300gg-5.

3.      The guaranteed issue and community rating provisions created significant uncertainty for health insurers in setting premiums beginning in calendar year 2014, because they could no longer engage in medical underwriting.  Further, insurers had to navigate a number of other market reforms in the ACA, and knew little of the health status or health needs of the millions of previously uninsured individuals who would have access to affordable insurance for the first time.

4.      In order to reduce incentives for health insurance issuers to set high premiums to accommodate this uncertainty, and to encourage competition in the individual and small group markets, the ACA put in place three interrelated premium stabilization programs, which are sometimes referred to as the "Three Rs":  reinsurance, risk corridors, and risk adjustment.  ACA §§ 1341-1343; 42 U.S.C. §§ 18061-18063.  The first two are temporary programs that operate

only during the first three years of full implementation of the ACA, *i.e.*, 2014 through 2016. This case involves the third program: risk adjustment.

5.      The risk adjustment program was designed to discourage insurers from targeting only healthy people and to protect insurers that enrolled people at higher risk of incurring increased health care costs.  Under the statute, States are to assess and collect payments from plans in the individual and small group markets whose enrollees' "actuarial risk" is below the state average ("low actuarial risk") of all enrollees in those plans, and payments are made to plans whose enrollees' "actuarial risk" is higher than the state average ("high actuarial risk") of all enrollees.  ACA § 1343.  The ACA tasks the Secretary of Health and Human Services ("HHS") with establishing the "criteria and methods" for the risk adjustment program, and the Secretary has delegated this authority to the Centers for Medicare & Medicaid Services ("CMS") within HHS.  *Id.* § 1343(b).

6.      In exercising this authority, CMS created a methodology for calculating risk adjustment payments that does not accurately measure plans' "actuarial risk," as required by Section 1343 of the ACA.  In particular, this methodology substantially understates the actuarial risk of the populations enrolled in health plans issued by new market entrants, and correspondingly overstates the actuarial risk of populations enrolled in plans issued by longstanding insurers.

7.      Plaintiff Evergreen Health Cooperative Inc. ("Evergreen Health") is a new entrant to the Maryland health insurance market.  Evergreen Health was formed in 2012 with the goal of offering an innovative health insurance option focused on patient-centered, cost-effective primary care.  Evergreen Health first enrolled members in 2014 and now serves almost 40,000 consumers in Maryland.

8.      Because of flaws in CMS's risk adjustment methodology, Evergreen Health projects it will be assessed a 2015 risk adjustment payment of approximately $22 million, which equates to 26 percent of its 2015 premium revenue.  A payment of this size places Evergreen Health at risk of falling below the state's reserve requirements under Maryland insurance law, and it would prevent Evergreen Health from using premium revenue to improve the benefits it provided to its members.

9.      Evergreen Health seeks to enjoin the federal Government from collecting any assessment from Evergreen Health calculated under CMS's arbitrary, capricious, and unlawful implementation of the risk adjustment program.

## II.      Jurisdiction and Venue

10.     This Court has subject matter jurisdiction over the Plaintiff's claims under Article III of the United States Constitution and 28 U.S.C. § 1331.  Judicial review is authorized by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

11.     Venue is proper in this district under  28 U.S.C. § 1391(e).

## III.     Parties

12.     Plaintiff Evergreen Health Cooperative Inc. is based in Baltimore City, with its principal place of business located at 3000 Falls Road #1, Baltimore, MD 21211.  Evergreen Health offers health insurance coverage in Maryland's individual, small group, and large group markets.

13.     Defendant United States Department of Health and Human Services ("HHS") is the federal agency responsible for overseeing federal regulation of health insurance markets.

14.     Defendant Centers for Medicare & Medicaid Services ("CMS") is the agency within HHS immediately responsible for overseeing federal regulation of health insurance markets, including the reinsurance, readjustment, and risk corridors programs.

3

15.     Defendant Sylvia Mathews Burwell is the Secretary of HHS and is responsible for the overall administration of HHS.  She is sued in her official capacity.

16.     Defendant Andrew M. Slavitt is the Acting Administrator of CMS and is responsible for overseeing CMS.  He is sued in his official capacity.

17.     Defendants are collectively referred to as "the Government."  Defendants' address is 200 Independence Avenue, SW, Washington, DC 20201

## IV.     Statement of Facts

### A.     The Affordable Care Act

18.     On March 23, 2010, Congress enacted the ACA.  The ACA dramatically re-shaped private health insurance markets nationwide through a series of programs and reforms that became effective on a rolling basis from 2010 through January 1, 2014.

19.     One goal of the ACA was to increase competition in health insurance markets and to make it easier for consumers to compare plan prices and benefits.  To that end, the ACA created new Health Insurance Marketplaces (also called "Health Benefit Exchanges") through which insurers can sell individual and small group plans.  States have the option to run their own Marketplaces, which Maryland chose to do.  If a state chooses not to run a Marketplace, the federal Government will run the Marketplace in the State.  *See* ACA §§ 1311-1321, 42 U.S.C. §§ 13031, 18032, 18041.

20.     In order to be sold through the Marketplaces, health plans must meet certain criteria; plans that are certified by the Marketplace as meeting these criteria are considered to be "Qualified Health Plans."  *See* ACA § 1301, 42 U.S.C. § 18021.  Consumers below certain income thresholds can receive tax credits and cost sharing subsidies to help purchase Qualified Health Plans that are sold through the Marketplace.  ACA §§ 1401-1402, 26 U.S.C. § 36B, 42 U.S.C. § 18071.  While health insurance issuers sell Qualified Health Plans and other individual

and small group plans outside of the Marketplaces, tax credits and subsidies are only available for plans purchased through the Marketplaces. *Id.*

21.     The ACA included a number of significant health insurance market reforms, including the "guaranteed issue" and "community rating" provisions, which prohibit health insurers from denying coverage or setting premiums based on health status or medical history. ACA § 1201(2)(A).  Under the ACA, health insurers face a risk of adverse selection, now that they are generally prohibited from excluding enrollees or pricing based on health status.

22.     The ACA's Marketplaces, tax credits, cost sharing subsidies, and market reforms, as well as the ACA's "individual mandate" requiring consumers to have "minimum essential" health care coverage, led to millions of new enrollees seeking coverage in the individual and small group markets starting in 2014.

23.     To address the uncertainties and challenges that Congress expected in the health insurance market for the first few years of full implementation of the ACA, and to address the effects of adverse selection on an ongoing basis, the ACA created three interrelated market stabilization programs, which the Government collectively calls "premium stabilization programs," also referred to as the "Three Rs": risk adjustment, risk corridors, and reinsurance. ACA §§ 1341-1343.  As explained by CMS, the "overall goal" of the premium stabilization programs "is to provide certainty and protect against adverse selection in the market while stabilizing premiums in the individual and small group markets as market reforms and [sic] Exchange begin in 2014."  CMS, *Reinsurance, Risk Corridors, and Risk Adjustment Final Rule* (Mar. 2012), available at https://www.cms.gov/cciio/resources/files/downloads/3rs-final-rule.pdf.

### 1.    Risk Adjustment Payments

24.    Section 1343(a)(1) of the ACA requires States to charge issuers in the individual and small group markets a risk adjustment assessment if the "actuarial risk" of their enrollees is less than the average actuarial risk in the state:

> each State shall assess a charge on health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is less than the average actuarial risk of all enrollees in all plans or coverage in such State for such year that are not self-insured group health plans  (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

The statute refers to these as "low actuarial risk plans."

25.    Section 1343(a)(2) requires States to make risk adjustment payments to issuers in the individual and small group markets if the "actuarial risk" of their enrollees is greater than the average actuarial risk in the state:

> each State shall provide a payment to health plans and health insurance issuers [in the individual or small group market within the state] . . . if the actuarial risk of the enrollees of such plans or coverage for a year is greater than the average actuarial risk of all enrollees in all plans and coverage in such State for such year that are not self-insured group health plans (which are subject to the provisions of the Employee Retirement Income Security Act of 1974).

The statute refers to these as "high actuarial risk plans."

26.    Section 1343(b) requires the Secretary of HHS, "in consultation with the States," to develop "criteria and methods" to implement the risk adjustment program.  These "criteria and methods" "may" be "similar to" those used in Medicare Part C (Medicare managed care, also known as Medicare Advantage) or Medicare Part D (the Medicare prescription drug benefit).

## 2.      Risk Corridors Payments

27.      Section 1342 of the Act directs the Secretary of HHS, for the first three years of

full ACA implementation, *i.e.*, 2014 through 2016, to make risk corridors payments to any

Qualified Health Plan that, for the applicable year, had health care costs that were more than

three percent greater than a target amount based on aggregate premiums charged by the plan in

the applicable year.  Specifically, Section 1342 provides in relevant part:

> (b) PAYMENT METHODOLOGY. —
> > (1) Payments out. — The Secretary shall provide under the program established under subsection (a) that if —
> > > (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, ***the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent*** of the target amount; and
> > > (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, ***the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent* of the target amount**.

(emphasis added).  Subsection 1342(c) defines allowable costs as "an amount equal to the total

costs (other than administrative costs) of the plan in providing benefits covered by the plan," and

it defines "target amount" as "an amount equal to the total premiums (including any premium

subsidies under any governmental program), reduced by the administrative costs of the plan."

28.      In other words, if a plan's allowable costs are more than three percent above the

total of the plan's premium revenue less the plan's administrative costs, the plan is entitled to a

payment equal to 50 to 80 percent of the plan's costs over that three percent threshold.

29.      A risk adjustment payment made by a health plan is one of the costs included in

the calculation of a plan's allowable costs for purposes of determining eligibility for, and

calculating the amount of, a risk corridors payment.

### B.    Evergreen Health

30.    Evergreen Health formally launched in September 2012.  The physician involved in forming Evergreen Health was Peter Beilenson, MD, a longtime public health leader in Maryland.  Dr. Beilenson, a resident of Baltimore County, served as the Baltimore City Health Commissioner from 1992 to 2005.  From 2007 to 2012, Dr. Beilenson led the Howard County Health Department.  Dr. Beilenson resigned from his position in Howard County in 2012 to lead Evergreen Health as its President & Chief Executive Officer ("CEO").

31.    Evergreen Health was founded to offer a new and different kind of private health care coverage for Maryland residents, based in part on the successful Healthy Howard program launched under Dr. Beilenson's leadership in Howard County in 2008.

32.    Evergreen Health combines traditional health insurance with patient-centered primary care and integrated health coaching and care coordination.  Under this model, in addition to covering benefits through a network of third party providers, Evergreen Health's affiliated company (also a non-profit) offers all of its members the option to receive care from one of four "Evergreen Health Care Primary Care Offices" located in Baltimore City, Greenbelt, White Marsh, and Columbia.  These offices offer: treatment and preventive care (medical and behavioral), patient monitoring, care coordination, and wellness planning to encourage healthy behaviors.  The caseload for providers at Evergreen Health Care Primary Care Offices is approximately half the national average, and the offices are thus able to spend approximately twice as much time with patients compared to other primary care offices.  The Evergreen Health Care Primary Care Offices also offer patients better access to their health care providers and health information, through a 24/7 telephone line for urgent health concerns and an online portal to allow patients to efficiently schedule appointments, access test results, and communicate securely with their health care providers.

33.     Evergreen Health began selling plans in Maryland, both through the Marketplace and outside the Marketplace, on October 1, 2013, with coverage effective January 1, 2014.

34.     Unfortunately, major technical problems with Maryland's online Marketplace contributed to a slower-than-expected enrollment in Evergreen Health.  By the end of 2014, Evergreen Health had 11,694 members (408 members in individual market plans; 11,286 members in small group plans).

35.     As the online Marketplace began to improve, and as consumers came to learn about Evergreen Health, its enrollment expanded dramatically.  By the end of 2015, Evergreen Health's enrollment had nearly tripled, to 29,680 members.  Evergreen Health's premium revenue increased from $12,298,714 in 2014, to $85,781,847 in 2015, which is an increase of almost 700 percent.

36.     As of April 30, 2016, Evergreen Health had 38,510 members: 11,210 members in the individual market; 24,186 members in the small group market; and 3,114 members in the large group market.  Of these, 15,887 members are enrolled in Qualified Health Plans: 8,531 in individual market Qualified Health Plans and 7,356 in small group market Qualified Health Plans.

37.     Over 7,000 of Evergreen Health's members have chosen to receive patient-centered, coordinated primary care through an Evergreen Health Care Primary Care Office.

38.     Evergreen Health offers the type of health coverage that holds the promise of helping to improve the quality of care while driving down costs.  CMS Acting Administrator Slavitt has stated that Evergreen Health "is exactly the kind of example of the kind of competition and the kind of innovation that unique small companies can provide . . . . " *Healthcare CO-OPS: A Review of Financial Oversight and Controls: Hearing Before the S.*

*Comm. on Fin.*, 114th Cong. (Jan. 21, 2016) (statement of Andy Slavitt), available at http://www.finance.senate.gov/hearings/healthcare-co-ops-a-review-of-the-financial-and-oversight-controls.  Similarly, Maryland Insurance Commissioner Al Redmer, Jr., appointed by Governor Lawrence J. Hogan, has cited Evergreen Health as a new, innovative health care model that improves competition and patient care in the state's health insurance markets.  *Review of Obamacare Consumer Operated and Oriented Plans (CO-OPs): Hearing Before the H. Oversight & Government Reform Comm.*, 114th Cong. (Feb. 25, 2016) (statement of Al Redmer, Jr.), available at https://oversight.house.gov/wp-content/uploads/2016/02/2016-02-25-Written-Testimony-Redmer-MIA.pdf.

> **C.     The Government's Unreasonable Risk Adjustment Methodology**
>
> **1.     Implementation of the Risk Adjustment Program**

39.     On March 23, 2012, CMS finalized regulations establishing the framework for implementation of the Section 1343 risk adjustment program.  77 Fed. Reg. 17,220 (Mar. 23, 2012).  While Section 1343 provided that "each State shall" assess or make risk adjustment payments, the final rules gave authority to the federal Government to run the risk adjustment program.  Under the final rules, states that do not operate their own Marketplaces (as most do not) are precluded from operating their own risk adjustment programs; instead, the federal Government will operate its own risk adjustment calculation model and system for assessing, collecting, and making risk adjustment payments in these states.  45 C.F.R. § 153.310(a)(4).  States that elected to operate their own Marketplaces, like Maryland, may develop and implement their own "alternative" risk adjustment methodologies, but only if they comply with a number of federally-determined standards, 45 C.F.R. § 153.330, and obtain the federal Government's certification of the model.  § 153.310(d).

40.     Maryland did not develop and obtain certification from the federal Government for its own risk adjustment model, and thus CMS's methodology applies to Evergreen Health and other issuers and plans in Maryland.

41.     On March 11, 2013, CMS finalized and published the details of its methodology for calculating risk adjustment payments (hereafter, "the Government's Risk Adjustment Methodology").  The methodology calculates separate risk adjustment payments for infants, children (ages 2 through 20), and adults, as well as separate payments for the different types of insurance that a plan may offer.  The Government's Risk Adjustment Methodology uses a "concurrent data model," *i.e.*, it uses data provided by the issuers from the year for which the adjustment assessment or charge applies.  *See* 78 Fed. Reg. 15,410, 15,419-52 (Mar. 11, 2013).

42.     While the calculation of the risk assessment transfer payment is complex, the primary input is the actuarial "risk score" for each enrollee.  A high risk score assumes that the individual has more complex health needs that are likely to result in higher health care costs.  A low risk score assumes that the individual has low health care needs and will incur fewer health care costs.

43.     The risk score starts with a coefficient (*i.e.*, a numeric value) for each individual based on age and gender (except for the infant model; all infants start with the same age and gender coefficient).  This demographic-based coefficient is supplemented if the enrollee has been assigned one or more hierarchal condition categories ("HCCs") that correspond with a certain condition or diagnosis. Examples of HCCs include "HIV/AIDS"; "Diabetes without Chronic Complications"; "Asthma"; and "Drug Dependency."  Each of these HCCs has a coefficient (numeric value) that is added to the age/gender coefficient.  The HCC coefficient may also be adjusted based on disease interaction and severity.  *Id.* at 15,419-25.

44.     Under the Government's Risk Adjustment Methodology, individuals are associated with HCCs only when a health care provider diagnoses a condition or recognizes a diagnosis <u>during the time in which the individual is enrolled in the plan in the applicable calendar year</u>, properly codes that diagnosis, and transmits that information to the plan issuer. For example, an individual will receive a diabetes HCC only when he/she visits a physician, during a month in which he/she is enrolled in the plan in the applicable calendar year, and the physician records and transmits a diabetes diagnosis to the issuer.    There are additional requirements for encounters to be acceptable for inclusion in the HCC submission.  For example, a claim submitted by a radiologist interpreting an MRI would generally not be eligible, since it may not conclusively identify the presence of a diagnosis.

45.     However, individuals with one of the conditions included in the HCCs will not be assigned an HCC if they have not visited a health care provider since enrolling in the plan.  The risk score for members who have not been assigned an HCC in that calendar year is simply the age/gender coefficient value.   They thus have a lower risk score than members of similar age/gender that have an HCC recorded, even if the plan has clear evidence that the enrollee has an HCC condition.  For example, if a plan knows that a new enrollee has diabetes because each month he/she fills an insulin prescription, the plan cannot use that information to assign an HCC to the enrollee.  Enrollees can only receive an HCC if they have been diagnosed by a health care professional during the time they are enrolled in the plan, within the applicable calendar year. *See id.* at 15,417 (explaining that the model uses "current year diagnoses").

46.     These risk scores are used to develop an enrollment-weighted average risk score for the plan.  This average risk score is an input in the payment transfer formula that calculates the plan's risk adjustment payment or receipt.  While not required by statute, the Government

developed the transfer formula to be budget neutral, *i.e.*, all payments made to "high actuarial risk" plans are wholly subsidized by payments from "low actuarial risk" plans.  The net of all risk adjustment payments in a state will equal zero.  *See, e.g.*, *id.* at 15,441.

47.     Because the Government's Risk Adjustment Methodology is a concurrent model, it is impossible to know plans' risk scores and payment transfers until after the calendar year has concluded, and the Government does not inform plans of the risk adjustment payments until June 30 following the end of the applicable calendar year, § 153.310(e).  This uncertainty and delay limits plans' ability to factor potential risk adjustment payments into their premium prices.  As required by the Maryland Insurance Administration ("MIA"), Evergreen Health submitted its 2014 rates for approval to the state regulators on April 1, 2013, more than two years before it could expect to know the amount of its 2014 risk adjustment assessment.  Similarly, Evergreen Health submitted its 2015 rates for approval to the MIA on May 1, 2014, before it knew about its 2014 risk adjustment assessment and more than two years before it could expect to know the amount of the 2015 risk adjustment assessment.  Evergreen Health submitted its 2016 rates for approval on May 1, 2015, before it knew about its 2014 risk adjustment assessment and more than two years before it could expect to know about the amount of the 2016 risk adjustment assessment.  On May 2, 2016, Evergreen Health submitted its 2017 rates for approval, before it knew about its 2015 risk adjustment assessment.

    **2.     Unreasonable Features of the Government's Risk Adjustment Methodology**

48.     Because of flaws in the Government's Risk Adjustment Methodology, the Government miscalculates the actuarial risk of enrollees in plans issued by new market entrants such as Evergreen Health.

49.     <u>First</u>, the Government's Risk Adjustment Methodology fails to make an adjustment for the understated health status of individuals who are enrolled in a plan for less than a full year, which disproportionately impacts new market entrants and rapidly-growing plans.  A large percentage of enrollees in new market entrants' plans, and in rapidly growing plans, have been enrolled in the plan for only a short period of time in the calendar year, and thus there is a greater likelihood they have not visited a health care provider since their coverage began and the issuer does not have their HCC diagnosis information.  This is true even if the member is incurring significant health care costs, such as prescription drug costs, related to the un-recorded condition or diagnosis (e.g., insulin prescriptions for a diabetic).  In contrast, enrollees in long-existing plans are more likely to have been enrolled in their plan during the full calendar year, which makes it much more likely the issuer will have their HCC diagnoses.  As a result, a higher percentage of enrollees with acute or chronic conditions in new market entrants will lack a recorded HCC diagnosis, compared to enrollees with similar conditions in plans issued by longstanding issuers.  The Government's Risk Adjustment Methodology did not include any measure to address the this issue.

50.     The problem of partial year enrollment is particularly acute in the small group market.  In the individual market, the plan year coincides with the calendar year, providing coverage from January 1 through December 31.  Individuals can enroll for the upcoming calendar year during an "open enrollment" period beginning in the fall of the prior year, so most people (though not all) enrolled in the individual market will have been enrolled in their plan for the entire calendar year for which risk adjustment is calculated.  However, enrollment in the small group market can occur at any time, and a large proportion of small group employers enroll their employees for plan years beginning on dates other than the start of the calendar year.

For example, consider a small employer that switches from Plan X to Evergreen Health on July 1, 2015, mid-way through the calendar year.  If an employee with diabetes visits a physician in the first six months of 2015, but not in the second half of the year, he or she will have an HCC code for purposes of calculating Plan X's risk adjustment assessment, but that very same employee will not have an HCC code – and thus will have the same risk score as a healthy enrollee – for purposes of calculating Evergreen Health's risk adjustment assessment.  That is, this methodology allows risk scores to be calculated in part based on the arbitrary factor of when in the calendar year enrollees happen to visit a primary care physician.

51.    Second, preexisting issuers have a substantial information advantage over new market entrants.  A much higher percentage of enrollees in plans issued by longstanding market participants, compared to enrollees in plans issued by new market entrants, have been enrolled in a plan with that issuer prior to the current calendar year.  As a result, longstanding issuers are much more likely to have diagnosis information about their enrollees from previous calendar years, which they use to target outreach to specific high-risk enrollees to ensure that they visit a physician to get appropriately coded during the current calendar year (e.g., through targeted reminders and incentives to visit a primary care physician before the end of the calendar year).  Because of this informational advantage, a higher percentage of enrollees with acute or chronic conditions in plans issued by longstanding insurers have a recorded HCC code, compared to enrollees with similar conditions in plans issued by new market entrants.  The Government's Risk Adjustment Methodology did not include any measure to address the information imbalance between new plans and established plans.

52.    Third, the Government's Risk Adjustment Methodology does not use prescription drug data in the calendar year in assessing an enrollee's risk.  Prescription drug data is an

effective and reliable indicator of health status, and it is particularly useful in a concurrent model, where plans' information about enrollees' diagnoses may not be complete.  Because prescriptions are filled regularly, new market entrants such as Evergreen Health, which have many partial calendar year enrollees, are more likely to have information regarding an enrollee's prescriptions than they are to have an HCC code associated with an enrollee.  The Government's methodology arbitrarily prevents plans from using information they possess to more accurately determine the actuarial risk of their enrollees.

53.     The actuarial inaccuracy caused by these flaws in methodology is exacerbated by several other features of the Government's Risk Adjustment Methodology.  Principal among them is the Government's decision to make the risk adjustment payments budget neutral, which is not required by the statute.  In order to "normalize" the risk scores to make the risk adjustment payments budget neutral, the Government uses a risk adjustment transfer formula that multiplies risk scores (adjusted for characteristics such as geographic area, induced demand, and allowable rating factors) by the statewide premium average.  Using the statewide premium average for these purposes inflates the impact of the risk adjustment payment in relation to actual premium revenue for plans, like Evergreen Health, with premiums below the statewide average, compared to a potential alternate risk adjustment payment transfer method that instead uses a plan's own average premium.

54.     In addition, longstanding insurers have the experience and an opportunity to establish mature "code chasing" systems and processes, and they have more resources to spend on these efforts.  Nothing in the Government's Risk Adjustment Methodology accounts for this experience and resources imbalance.

55.     The Government has been aware of the problems with its methodology since 2013.   In response to the original proposed rule announcing the methodology, several commenters asked CMS to incorporate prescription drug data into the model.  The Government brushed aside the request: "HHS is finalizing its proposal to exclude prescription drugs for the initial HHS risk adjustment models, but will consider how prescription drugs could be included in future HHS risk adjustment models."  78 Fed. Reg. at 15,419.  In response to CMS's March 2014 notice that it would continue to use the methodology in 2015, several commenters again requested that the methodology "incorporate pharmacy utilization in the risk adjustment model." 79 Fed. Reg. 13,744, 13,753 (Mar. 11, 2014).   CMS again refused, this time citing the importance of "maintain[ing] model stability in implementing the risk adjustment methodology in the initial years of risk adjustment."  *Id.*

56.     In 2015, several non-profit health plans formed the "CHOICES" Coalition – Consumers for Health Options, Insurance Coverage in Exchanges in States – to advocate for improvements to the Government's Risk Adjustment Methodology.  A CHOICES report by Richard S. Foster, FSA, MAAA – who served as Chief Actuary of CMS from 1995 through 2012 – identified a number of critical technical flaws with the Government's Risk Adjustment Methodology.  CHOICES sent this report to Secretary Burwell on November 4, 2015.  Rick S. Foster et al., *Technical Issues with ACA Risk Adjustment and Risk Corridor Programs, and Financial Impact on New, Fast-Growing, and Efficient Health Plans* (Nov. 4, 2015), available at http://www.choicescoalition.org/documents/CHOICES%20White%20Paper%20on%20Risk%20 Adjustment.pdf  and  http://nashco.org/wp-content/uploads/2015/11/CHOICES-White-Paper-on-Risk-Adjustment-Issues.pdf.

57.     Throughout 2015, a number of new entrants to the insurance market across the country went out of business.  Many of these new market entrants cited the risk corridors and/or risk adjustment programs as key contributors to their downfall.

58.     In March 2016, in the face of mounting criticism of its risk adjustment formula, CMS published a "Discussion Paper," in which it explained and defended its methodology, but also acknowledges many of the problems with the methodology that issuers and other stakeholders had been calling attention to for years.  CMS, *March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting Discussion Paper* (Mar. 24, 2016), available at https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/RA-March-31-White-Paper-032416.pdf.

59.     On May 11, 2016, CMS again recognized the problematic impacts of the Government Risk Adjustment Methodology on new and rapidly growing issuers, and "encourage[d] States to examine whether any local approaches, under State legal authority, are warranted to help ease this transition to new health insurance markets."  81 Fed. Reg. 29,146, 29,152 (May 11, 2016).  However, CMS subsequently orally informed issuers and state regulators that assessment and collection under the Government Risk Adjustment Methodology must go forward before state regulators can take any steps "to help ease this transition."  While state regulators (including regulators in Maryland) have proposed various methods for mitigating the impact of the Government's Risk Adjustment Methodology on new market entrants, CMS has yet to agree that any such state proposal is permissible.

60.     Finally, on June 8, 2016, CMS published a fact sheet announcing two changes to its methodology.  The announcement appears to accept and address some of the major flaws that were flagged by CMS's former chief actuary and others.  However, CMS will only make the

changes prospectively.  First, starting in 2017, the methodology will include an adjustment factor to account for partial-year enrollees.  CMS explained that this change will "accurately account[] for the costs of short term enrollees in ACA-compliant risk pool."  Second, starting in 2018, CMS will incorporate prescription drug data into the methodology.  CMS, *Fact Sheet: Strengthening the Marketplace – Actions to Improve the Risk Pool* (June 8, 2016), available at https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-06-08.html; *see also* CMS, *March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting, Questions & Answers* (June 8, 2016), available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/RA-OnsiteQA-060816.pdf.  These critical changes come too late for small, new market entrants like Evergreen Health, which will be assessed an indefensibly large risk adjustment payment for 2015, and likely for 2016 as well, based on CMS's flawed methodology.

### 3.    The Government's Unreasonable Decision to Collect Risk Adjustment Payments Without Making Interrelated Risk Corridors Payments

61.    In October of 2015, the Government announced that it will not make the full risk corridors payment to which Evergreen Health and other plans are entitled under Section 1342 of the ACA.  For the 2014 risk corridors payments, the Government paid out only 12.6 percent of the amount due to any Qualified Health Plan, including Evergreen Health.  The Government acknowledged that it has a legal obligation to make full risk corridors payments to Qualified Health Plan issuers, but asserted that it currently lacks sufficient funding to meet these legal obligations.  In addition, the Government announced that it will not pay any of its 2015 risk corridors obligations, unless and until it receives sufficient funding, in the form of risk corridors payments from insurers, to satisfy its $2.5 billion debt to all Qualified Health Plans for the 2014 risk corridors obligations, an extremely unlikely event, given that the Government received only

$362 million in risk corridors payments in 2014.  *See* CMS, *Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf; CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/RC _Obligation_Guidance_11-19-15.pdf.

62.     The interplay between the risk adjustment payments and the risk corridors program exacerbates the harm to Evergreen Health.  Because Evergreen Health can count the cost of its risk adjustment payment as an allowable cost for purposes of calculating its risk corridors payment, and because the payment will cause it to suffer losses in 2015, it would be entitled to a risk corridors payment that would substantially offset the risk adjustment liability. However, because of the Government's refusal to honor its risk corridors obligations, it is highly unlikely that Evergreen Health will receive those funds and, under guidance from the National Association of Insurance Commissioners ("NAIC") and the MIA, Evergreen Health may not book the risk corridors payment as a receivable countable towards its surplus.  NAIC, *INT 15-01: ACA Risk Corridors Collectability*, available at http://www.naic.org/documents/committees_e_app_eaiwg_related_int_1501_risk_corridors.pdf.

**D.      The Impact of the Risk Adjustment Assessment on Evergreen Health**

63.     In 2014, Evergreen Health was assessed a "default" risk adjustment payment of $2,752,054 due to errors in some of the data that it had submitted to CMS for purposes of the risk adjustment calculation.

64.     Evergreen Health immediately addressed those errors and, towards the end of 2015, worked with its actuary to project its risk adjustment payment for 2015 to include on its

end-of-year financial statements. Because the formula uses concurrent data and is dependent on how Evergreen Health's risk scores compare to other Maryland insurers, the actuary projected that the liability could be anywhere between $4 million and $12 million, with the most likely outcome being the midpoint of $7.5 million.

65.     Concerned that the uncertainty and magnitude of such a risk adjustment payment could threaten its ongoing operations, Evergreen Health attempted to work with CMS throughout 2015 to address the problems with the Government's Risk Adjustment Methodology and its deleterious impact on new market entrants. Evergreen Health's CEO Peter Beilenson had several meetings and discussions, plus countless written correspondence, with both Acting Administrator Slavitt and Kevin Counihan, CMS's CEO of the Marketplaces.

66.     These discussions became more urgent when 2015 data was finalized and Evergreen Health's actuary, based on information provided by the MIA and CMS, projected a risk adjustment payment of $18-$22 million, substantially higher than its earlier projections, and representing approximately between 21 percent and 26 percent of Evergreen Health's $86 million in premium revenue for 2015. CMS has confirmed in conversation with Dr. Beilenson that Evergreen Health's estimated payment will be in that range.

67.     The Maryland Insurance Commissioner has also met with CMS out of concern that Evergreen Health's risk adjustment payment threatens stability and competition in the Maryland insurance marketplace.

68.     CMS has refused to take any action, other than the prospective changes it has belatedly announced to take effect in 2017 and 2018.

69.     Evergreen Health expects CMS to announce and notify it of its assessment on June 30, 2016. Evergreen Health expects CMS to require payment of the assessment through

two transactions, to occur on July 15, 2016 and August 15, 2016, respectively.  This 2015 risk adjustment assessment is higher than is warranted by the actual actuarial risk of Evergreen Health's population.  The Government's Risk Adjustment Methodology incorrectly under-calculated the actuarial risk of Evergreen Health's population, for the reasons described in ¶¶48-60.

70.     As of April 30, 2016, Evergreen Health had $28,200,845 in total current assets; $57,657,310 in total assets (including investments); and $32,690,354 in total liabilities.

71.     Imposition of a $22 million risk adjustment assessment would wipe out much of Evergreen Health's reserves, and put it at risk of falling below the state Risk-Based Capital ratios and minimum financial reserve requirements.

72.     If Evergreen Health's assets fall below the State of Maryland's risk-based capital requirement, the Maryland Insurance Commissioner will take action that would significantly effect Evergreen Health's business.  *See* Md. Code Ann., Ins. §§ 9-102, 9-103, 9-104, 9-204, 9-209–9-215, 9-231.

73.     For 2015, if Evergreen pays the $22 million assessment, Evergreen Health's allowable costs for Qualified Health Plans will exceed 108 percent of the risk corridors target amount and thus CMS will owe Evergreen Health an additional risk corridors payment that could offset a substantial portion of the risk adjustment liability.  Specifically, CMS will owe Evergreen Health either 50 percent or 80 percent of the entire risk adjustment payment amount that is attributable to Evergreen Health's Qualified Health Plans.  However, as described in ¶61, CMS has announced that it will not make any risk corridors payments for 2015, unless and until it receives sufficient risk corridors payments from insurers to satisfy its $2.5 billion debt to all

Qualified Health Plans for the 2014 risk corridors obligations, which is an extremely unlikely event.

## CLAIM FOR RELIEF

### COUNT ONE
### (Violations of Section 1343 of the ACA and the APA, 5 U.S.C. § 706)

74.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

75.    Section 1343 of the ACA instructs the Secretary to develop criteria and methods to assess the "actuarial risk" of "all enrollees in all plans or coverage" in a State.

76.    The Government's Risk Adjustment Methodology understates the actuarial risk of Evergreen Health's enrollees as compared to the average risk of all enrollees in all plans in Maryland.  As a result, as applied to Evergreen Health, the Government's Risk Adjustment Methodology is not in accordance with Section 1343 and is arbitrary and capricious, in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.

### COUNT TWO
### (Violations of Sections 1342 and 1343 of the ACA and the APA, 5 U.S.C. § 706)

77.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

78.    The Government's decision to assess and collect the full risk adjustment payments that it alleges Evergreen Health owes, while refusing to honor its statutory obligation to make full risk corridors payments to Evergreen Health, is inconsistent with Sections 1342 and 1343 of the ACA, and thus is not in accordance with law in violation of the APA, 5 U.S.C. § 706.  This governmental action is also arbitrary and capricious in violation of the APA, 5 U.S.C. § 706.

## COUNT THREE
### (Violations of Section 1343 of the ACA and the APA, 5 U.S.C. § 706)

79.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

80.     Section 1343 of the ACA provides that "each State shall assess" a risk adjustment charge on low actuarial risk plans and that "each State shall provide" a risk adjustment payment to high actuarial risk plans.

81.     CMS regulations at 45 C.F.R. Subparts D and G, and the Government's Risk Adjustment Methodology, authorize and require the federal Government, not the state, to assess a risk adjustment charge on low actuarial risk plans and make a risk adjustment payment to high actuarial risk plans, if the state did not establish its own Marketplace or if the state did not seek and obtain CMS approval for its own risk adjustment program.  In establishing this system in which the federal government assesses and makes risk adjustment payments, the federal Government acted in excess of its statutory jurisdiction and authority, and the statutory limitations, set out in Section 1343 of the ACA, in violation of the APA, 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in its favor and against Defendant and to:

A.     Declare that the Government's Risk Adjustment Methodology is arbitrary, capricious, and contrary to law, in violation of the APA and Section 1343 of the ACA, as applied to Evergreen Health.

B.     Declare that the Government's policy of collecting full risk adjustment payments while refusing to make risk corridors payments is arbitrary, capricious, and contrary to law, in violation of the APA and Sections 1342 and 1343 of the ACA, as applied to Evergreen Health.

C.     With respect to Evergreen Health, enjoin the Government from applying, implementing, or enforcing the Government's Risk Adjustment Methodology

described in 78 Fed. Reg. 15,410 (Mar. 11, 2013) and 79 Fed. Reg. 13,744 (Mar. 11, 2014), including but not limited to:

1. Enjoin the Government from assessing a risk adjustment payment for Evergreen Health for 2015, 2016, and any future years pursuant to the Government's Risk Adjustment Methodology; and

2. Enjoin the Government from collecting, including through withholding payments owed to Evergreen Health, a risk adjustment payment from Evergreen Health for 2015, 2016 and any future years pursuant to the Government's Risk Adjustment Methodology; and

D.     With respect to Evergreen Health,

1. Enjoin the Government from assessing or collecting Section 1343 risk adjustment payments for 2015 or any future years, until the Government fulfills its statutory obligation to pay the full amount of the risk corridors payments that it owes Evergreen Health; or

2. Alternatively, enjoin the Government from assessing or collecting any amount in risk adjustment payments for 2015 and future years that the Government would subsequently owe back to Evergreen Health in risk corridors payments; and

E.     To the extent available, award Plaintiff costs and attorneys' fees; and

F.     Award Plaintiff such other and further relief as this Court may deem necessary and proper.

Respectfully submitted,


 /s/ Philip J. Peisch

Philip J. Peisch
(ppeisch@cov.com)
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC, 20001
(202) 662-6000
(202) 778-5225
Bar No. 17883

Mary T. Porter
(mtp@evergreenmd.org)
General Counsel and Chief Legal Officer
Evergreen Health Cooperative Inc.
3000 Falls Road #1
Baltimore, MD 21211
Bar No. 03060


June 13, 2016                                    *Counsel for Plaintiff*