UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| EVERGREEN HEALTH COOPERATIVE, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 1:16-cv-02039- GLR ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION AND FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND ............................................................................................. 3

ARGUMENT ................................................................................................. 6

I.   THE EXIGENCIES OF THE SITUATION DO NOT REQUIRE A
MANDATORY INJUNCTION ................................................................... 11

II.   PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER IS
PROCEDURALLY IMPROPER .................................................................. 17

III.   PLAINTIFF HAS SATISFIED NONE OF THE ELEMENTS REQUIRED TO
GAIN THE EXTRAORDINARY REMEDY OF A TEMPORARY RESTRAINING
ORDER OR PRELIMINARY INJUNCTIVE RELIEF ................................... 18

A.   Plaintiff Has Not Demonstrated a Likelihood of Irreparable Harm Absent an
Injunction .............................................................................................. 18

1.   Plaintiff has not established that its alleged harms are actual and imminent
and this Court could resolve this matter on the merits promptly ........................ 19

2.   Plaintiff's delay undermines its claim of imminent irreparable harm ........... 22

3.   Plaintiff's alleged harms would not support preliminary injunctive relief.... 24

4.   Plaintiff has not demonstrated that a preliminary injunction would prevent its
alleged harm ......................................................................................... 25

5.   Plaintiff has not demonstrated that a temporary restraining order would
forestall irreparable harm, either ............................................................... 27

B.   Plaintiff Has No Likelihood of Succeeding on the Merits ............................... 29

1.   Plaintiff will not avoid its risk adjustment assessment through its
methodology challenge ........................................................................... 29

2.   Plaintiff's challenge to the timing of its risk corridor payment does not alter
its risk adjustment assessment and belongs in the Court of Federal Claims ........ 42

3.   Plaintiff's challenge to the Department's statutory authority to operate the
risk adjustment program in Maryland will fail ............................................. 45

C.   A Preliminary Injunction or Temporary Restraining Order Would Irreparably
Harm Those the ACA Intended Risk Adjustment to Protect and be Contrary to the
Public Interest ....................................................................................... 47

CONCLUSION ............................................................................................. 50

## PRELIMINARY STATEMENT

The Affordable Care Act seeks to guarantee the availability of affordable health coverage for all Americans.  In furtherance of this goal, the Act prohibits insurers from denying coverage or increasing premiums because of an individual's medical history.  Despite this prohibition, insurers have an incentive still to seek to cherry-pick healthy individuals, thereby lowering premiums for the healthy and raising premiums for the sick.  To counter this incentive and the corresponding incentive of insurers that attract sicker individuals to raise their premiums, the Act provides a risk adjustment program.  Under this program, insurers with comparatively healthy enrollees will pay insurers with sicker enrollees, so that insurance companies do not have an incentive to avoid sicker individuals (or raise their premiums if they attract such individuals).

The Affordable Care Act entrusts the Department of Health and Human Services with the administration of this risk adjustment program in States that do not opt to administer it themselves.  Beginning in 2013, the Department has published annual notices setting forth its methodology for operating risk adjustment for each of the program's first four benefit years—for 2014, 2015, 2016, and 2017.  For the first benefit year, 2014, the program has gone all the way through its three-year annual life cycle—from publication of the methodology in the fall of the year two years preceding the benefit year, to notice and comment, to finalization of the methodology in the March preceding the benefit year, to data collection during and after the benefit year, to data submission after the benefit year, to calculation of estimated assessments and payments, to announcement of assessment and payments, and ultimately to collections and corresponding payments.  For the second benefit year, 2015, the program has reached the final stage.  Assessments and payments were announced on June 30, and all that is left is to collect

1

charges (from insurers with healthier-than-average enrollees) and make payments (to insurers with sicker-than-average enrollees).

Over the course of the last year, Plaintiff has repeatedly asked the Department (and Congress) to retroactively modify the risk adjustment program, going back to 2015, in order to reduce payments owed by it and other CO-OPs—a set of nonprofit, consumer-governed insurers created and funded by the ACA.  Plaintiff, like some other health insurers, enrolled healthier-than-average populations in the first two years of the ACA's reforms (2014 and 2015), resulting in an assessment of substantial risk adjustment charges for those years.  The Department has given significant consideration to the challenges facing the CO-OP program.  In a May 11, 2016 rulemaking, it exercised its authority to provide assistance to CO-OPs by making changes <u>within</u> the CO-OP program.  *Amendments to Special Enrollment Periods and the Consumer Operated and Oriented Plan Program*, 81 Fed. Reg. 29146 (May 11, 2016).  In the same rulemaking, the Department underscored that a "robust" risk adjustment program, is "critical to the proper functioning of the[] new markets."  *Id.* at 29152.  And it emphasized that states, as the "primary regulators of their insurance markets," are encouraged "to examine whether any local approaches, under State legal authority, are warranted to help ease [the] transition to new health insurance markets."  *Id.*

Plaintiff credits its ongoing viability to loans that the Department's recent reforms to the CO-OP program apparently made possible.  *See* 1st Declaration of Peter Beilenson Decl. ¶ 60, ECF No. 18-3 ("Beilenson Decl.").  But Plaintiff still believes it should be exempted from the 2015 risk adjustment program, or at least have its contribution capped.  So Plaintiff has filed emergency motions for a preliminary injunction and temporary restraining order, asking the Court to enjoin its 2015 risk adjustment assessment (which has *already been released*),

collection thereof (and so *payments to other insurers*), and also put a halt to the other two program life cycles (2016 and 2017) that are now in their youth and middle-age, as well as any other "future years."   The Court should deny Plaintiff's extraordinary, untimely request, for six independent reasons elaborated upon below: (1) Plaintiffs request is procedurally improper, both because it fails to even allege that a "mandatory" injunction is warranted even though it seeks to change the status quo, and because a TRO could not halt a step in the collection process that is more than 14 days away; (2) Plaintiff has not carried its burden of proving that irreparable harm is *likely* as opposed to merely "possible"; (3) Plaintiff has not explained how *temporary* emergency relief directed against Defendants would affect the State regulator's assessment of Plaintiff's solvency; (4) this APA matter could be resolved fully and finally quickly; (5) Plaintiff has not demonstrated a likelihood of success on the merits of any of its claims, particularly in light of the significant deference owed the Department; and (6) an emergency order would irreparably damage the public interest by disrupting insurance markets in Maryland and nationwide.

## BACKGROUND

Insurers were historically free to raise the premiums they charged to sick people—to account for the fact that sick people incur greater healthcare costs—and lower their premiums for healthy people.  Congressional Budget Office, Key Issues in Analyzing Major Health Insurance Proposals 9 (Dec. 2008), online at https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-18-keyissues.pdf.   But the ACA changed that by prohibiting discrimination based on health status except for a few limited exceptions and creating a number of programs that help effectuate that prohibition.  *See King v. Burwell*, 135 S. Ct. 2480, 2485 (2015);  *see generally* Valarie K. Blake, *An Opening for Civil Rights in Health Insurance After the Affordable*

*Care Act*, 36 B.C.J.L. & Soc. Just. 235, 255-56 (2016) (listing provisions of the ACA that prevent discrimination on the basis of health status). One of those programs, "risk adjustment," is at issue here. Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment, 77 Fed. Reg. 17220, 17230 (Mar. 23, 2012) ("The risk adjustment program is intended to reduce or eliminate premium differences between plans based solely on expectations of favorable or unfavorable risk selection or choices by higher risk enrollees[.]").

Through risk adjustment, insurers whose plans attract healthier-than-average enrollees (whether intentionally or unintentionally) must pay assessments that fund payments to the insurers whose plans wind up with the sicker-than-average enrollees. Because of these risk adjustment assessments and payments, the plans that attract healthier enrollees are discouraged from lowering their premiums to charge the healthy people less, and the plans that attract sicker enrollees need not raise their premiums to charge the sick people more. This system of assessments and corresponding payments is "based on the premise that premiums should reflect the differences in plan benefits and plan efficiency, *not the health status* of the enrolled population." HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15410, 15417 (March 11, 2013) (emphasis added). Risk adjustment also contributes to stability in the marketplace—along with two temporary three-year programs, the reinsurance program, 42 U.S.C. § 18061, and the risk corridor program, 42 U.S.C. § 18062—by reducing the uncertainty insurers face when they decide to participate in the marketplace and set their premiums.

The ACA gives each state the option of operating a risk adjustment program pursuant to standards promulgated, in advance, by the Department. 42 U.S.C. § 18063(b). The Department's standards require advance publication of a "complete description" of the risk adjustment methodology that will apply in any given calendar year. *See* 45 C.F.R. § 153.320

4

(advance notice must provide "complete description" of calculation and data collection methodology, including ""diagnostic factors," "weights," the "data approach," and a "schedule"); Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment, 77 Fed. Reg. 17220 (March 23, 2012).   Every state but Massachusetts initially deferred to the Department to operate its risk adjustment program (Massachusetts will do so beginning in 2017), and the Department has set forth its methodology for each plan year in advance in a series of regulations.   HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15410 (March 11, 2013); HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13744 (March 11, 2014); HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10749 (Feb. 27, 2015); HHS Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12216 (March 8, 2016).

Plaintiff Evergreen Health Cooperative is a new participant in the Maryland insurance marketplace, funded by subsidized loans offered by the Department under the "CO-OP" program of the Affordable Care Act.   *See* 42 U.S.C. § 18042(b)(1) (providing for "start-up loans" and "solvency loans" to CO-OPs); Beilenson Decl. ¶ 11 ("Evergreen Health was [] awarded . . . $65 million in federal loans").   The people who choose to enroll in Evergreen's insurance plans are healthier than those who enroll in plans offered by larger insurers like CareFirst Blue Choice or United Healthcare Insurance Company.   *See* Summary Report on Transitional Reinsurance Payments and Permanent Risk Adjustment Transfers for the 2015 Benefit Year at 31 (June 30, 2016) (ECF No. 18-3); Testimony of Peter Beilenson, MD, MPH, Before the House Committee on Energy and Commerce at 2 (Nov. 5, 2015) ("we have a healthier than average enrolled population") (Ex. A).

Because Plaintiff's enrollees are healthier than average, and even though it failed to submit appropriate data for 2014 and so was assessed (and paid) a "default" risk adjustment charge for that year, it has known for many months that HHS would assess it with a sizable risk adjustment charge for the 2015 plan year. *See* Beilenson Decl. ¶ 45 (in April, 2016, Evergreen's actuary estimated a $22 million payment); *id.* ¶ 38 (in February, 2016, Evergreen's actuary estimated a payment between $4 million and $12 million). As long expected, on June 30, 2016, the Department published its risk adjustment calculation for 2015, reflecting Evergreen's $24 million risk adjustment charge for that year.

Evergreen responded later on the same day, June 30, with a motion for preliminary injunction and supporting declarations, including a purported expert report, asking for a hearing by August 1. One week later, Evergreen sought a TRO asking for a ruling (rather than just a hearing) by that date. Careful review of its filings reveals that if there is an emergency at all, as Plaintiffs claim, then it is because Plaintiff has delayed so long in seeking judicial relief. Evergreen asks the Court to enjoin its 2015 risk adjustment assessment (and so payments to other insurers), to enjoin collection of the assessed charge, and to enjoin the Department "from applying, implementing, or enforcing the [] [r]isk [a]djustment [m]ethodology . . . for 2015, 2016, and any future years." Proposed Order, ECF No. 18-2 at 2.

## ARGUMENT

Plaintiff's filings do not establish that there is an actual emergency here that warrants immediate relief from the Court. Congress entrusted HHS with the administration of both the risk adjustment program and the CO-OP program, and the agency has reasonably and carefully exercised that authority here. There are six independent reasons why this Court should deny Plaintiff's motions for a temporary restraining order and a preliminary injunction.

*First*, the motions are procedurally improper.  Both would significantly change and disrupt the status quo, rather than preserve it, thereby directly harming other insurers (whose payments would be delayed).  That makes for a "mandatory" injunction, even more extraordinary than its "prohibitory" brother, which should be granted only when "the exigencies of the situation demand such relief."  *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).  Plaintiff does not even purport to meet this most-exacting standard, nor could it possibly, and the Court should deny its motions for that threshold reason.

Plaintiff's motion for a TRO is particularly improper.  Plaintiff asks the Court to enjoin an invoice that HHS will issue on August 10.  But that is beyond the permissible duration of a TRO; Federal Rule 65 provides that a TRO must expire "after . . . 14 days" unless the Court finds "good cause" to extend it.  Fed. Rule of Civ. Pro. 65(b)(2) (temporary restraining order expires "after . . . 14 days").  Accommodating Plaintiff's desire for the Court to rule three weeks prematurely is not "good cause," doing so would merely increase the risk of error, inappropriately so given developments that may obviate Plaintiff's claimed harm.  Today, HHS announced a policy concerning netting of subsidy payments for insurers that would otherwise be required to end coverage and informed the Maryland Insurance Administration ("MIA") of the policy and the potential beneficial effect of that policy for insurers in Maryland.  This development creates, at a minimum, substantial additional uncertainty as to the timing and likelihood of the adverse decision from the MIA that Evergreen fears.  That counsels heavily in favor of deferring resolution of the motion for a TRO until either greater clarity arises as to the underlying facts or the August 10 invoice Plaintiff seeks to halt is actually imminent.

*Second*, Plaintiff's filings do not demonstrate that irreparable harm is actual or imminent.  Evergreen's alleged harm for purposes of its preliminary injunction motion stems from the

7

impact of Plaintiff's 2015 risk adjustment assessment on Plaintiff's "risk-based capital" score, or RBC score, a calculation used by the Maryland Insurance Administration for purposes of estimating Plaintiff's solvency.   But the opaque, qualifying language in which Plaintiff talks about the "possibility" of harm due to its diminished solvency—"if," "may mean," "could"— is insufficient to carry Plaintiff's burden to demonstrate that irreparable harm is either "actual" or "imminent," as it must be to support preliminary injunctive relief.  *See* Pl.'s Mem. at 41-48.

Plaintiff's failure to establish irreparable harm underlying its motion for a TRO is even more pronounced.   That motion depends entirely on the allegation of a "possibility" the Maryland Insurance Commissioner will act in response to a failure to finalize by August 1 loans Plaintiff expects to finalize by August 15.  Pl.'s TRO Mem. at 4 (alleging "possibility" of harm). Even taking Plaintiff's assertions at face value, a possibility of harm is as a matter of law insufficient to support preliminary injunctive relief.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 21 (2008) (the "'possibility' standard is too lenient"); *id.* at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" (emphasis in original)).

*Third*, even if Plaintiff had shown irreparable harm flowing from the potential action of the MIA, Plaintiff offers no reason to believe that a temporary restraining order or preliminary injunction would actually impact the MIA's independent behavior.   Plaintiff should have been taking its estimated 2015 risk adjustment assessment into account for actuarial purposes for months, SSAP No. 107—Accounting for the Risk-Sharing Provisions of the Affordable Care Act, National Association of Insurance Commissioners ("SSAP No. 107"), and has been refusing to do so despite its own actuary's emphatic advice to the contrary in Plaintiff's public rate filing. *See* Evergreen Health Cooperative, Inc., 2017 Rate Filing at 9-10, May 13, 2016, Actuarial

Memorandum and Certification (Ex. B) (Evergreen 2017 Rate Filing).  But the MIA, for its part, insisted in its latest communications that Plaintiff include in its July 15, 2016 financial filing both "the *actual* amount for 2015 paid in 2016" and "the *projected payment* of the 2016 risk-adjustment amount in 2017."  June 15, 2016 MIA Letter at 2, ECF No. 18-3.  So even assuming irreparable harm were imminent, a preliminary injunction or TRO would not forestall such harm.

The same sort of defect—emergency relief would not even temporarily solve the supposed problem—fatally undermines Plaintiff's motion for a TRO, as well.  Plaintiff offers no reason, whatsoever, to believe that a brief court-ordered postponement of the agency's collection processes would cause the MIA to alter in any way its assessment of Plaintiff's solvency or depart from its plan to assess Plaintiff's solvency based on "the actual amount for 2015 paid in 2016."  June 15, 2016 MIA Letter at 2, ECF No. 18-3.  Indeed, the July 5, 2016 MIA email from which Plaintiff draws its supposed deadline *reiterates* that Plaintiff is to include on its books its "2015 risk adjustment payment and 5/12 of the best estimate of the 2016 risk adjustment assessment."  MIA July 5, 2016 Email, ECF No. 19-2.  Why Plaintiff believes the MIA would assume Plaintiff will *never* have to make its risk adjustment assessment based simply on a court-ordered two-week delay in the payment deadline, it does not say.  But Plaintiff cannot ask this Court to enter an order based on speculation about what a non-party, MIA, might do in response. *Cf. Clapper v. Amnesty, Int'l*, 133 S.Ct. 1138, 1149-50 (2013) ("we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").

*Fourth*, this APA matter could be resolved on the merits promptly, which is further reason emergency relief is not warranted.  The Department is willing to accommodate Plaintiff's desire to resolve this dispute quickly, and accordingly has already begun compiling the

administrative record of the two rules challenged here.  The Department contemplates that it will be able to lodge the record by the end of July—weeks before an answer is due.  Because APA cases like this one are resolved on the record via summary judgment motions, this case could be fully briefed on the merits in a matter of weeks.

*Fifth*, Plaintiff has not demonstrated a likelihood of success on the merits and is in fact likely to lose this APA case on summary judgment.  It is notable that Plaintiff has *not* opted to challenge in this action the Department's refusal to grant Plaintiff's request that it be retroactively exempted from the risk adjustment program, or have its payment capped, choosing instead to challenge the *methodology* the agency used to calculate the *amount* of Plaintiff's payment.  But in reviewing that methodology the Court's deference to the agency as expert policymaker is "at its peak," *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1107 (9th Cir. 2016), and the hyper-technical alleged errors asserted by Plaintiff are not errors at all, let alone errors that render the methodology arbitrary and capricious.  Indeed, even the CHOICES White Paper on which Plaintiff heavily relies states repeatedly that the methodology "was designed with considerable thought and care."   CHOICES White Paper at 1, *online at* http://nashco.org/wp-content/uploads/2015/11/CHOICES-White-Paper-on-Risk-Adjustment-Issues.pdf.  And Massachusetts, which previously ran its own risk adjustment program, opted to have HHS do so pursuant to the HHS methodology beginning in 2017.  81 Fed. Reg. 12,230.  Moreover, even if Plaintiff could show that the agency's methodology is arbitrary and capricious (it is not), it is hornbook administrative law that the remedy would be remand to the agency to reconsider that methodology and re-calculate Plaintiff's assessment, not outright abandonment of the risk adjustment program for 2015 or any other year.  And because Plaintiff's plans attract a

healthier-than-average population, changing the risk adjustment methodology would not save Plaintiff from paying a substantial assessment.

Similarly, Plaintiff is unlikely to succeed in its request that the Court order the agency to offset Plaintiff's $24 million risk adjustment assessment against Plaintiff's anticipated risk corridor payments because the anticipated payments are not presently due and Plaintiff's offset claim belongs to the exclusive jurisdiction of the Court of Federal Claims.  But even if none of that were the case, Plaintiff would not, by prevailing on its misplaced risk corridor claim wipe the risk adjustment assessment off its books.  And while Plaintiff further argues that the Department lacks the authority under the ACA to operate a risk adjustment program on behalf of Maryland in the first place, that claim is squarely foreclosed by the text of the Act itself.

*Sixth*, Plaintiff's proposed injunction and temporary restraining order would *cause* irreparable damage to the public interest.  Emergency relief would directly disrupt the operations of Maryland's insurers, because under the structure of the risk adjustment program postponing Plaintiff's assessment would mean postponing payments to other insurers.  And emergency relief would also create uncertainty about the risk adjustment program nationwide, thereby giving insurers pause about the stability of payments and so reason to raise rates (reducing the affordability of insurance) or exit the marketplace.  This Court should not inject more uncertainty into the market for health coverage, in Maryland and nationwide.

For all these reasons, elaborated upon below, the Court should deny Plaintiff's motion for preliminary injunction and permit the risk adjustment program to continue to operate as Congress intended pending prompt resolution of the merits.

## I.  THE EXIGENCIES OF THE SITUATION DO NOT REQUIRE A MANDATORY INJUNCTION

Plaintiff seeks a mandatory injunction that would alter the status quo, not a preliminary injunction (or temporary restraining order) to preserve the status quo. Plaintiff does not even purport to satisfy the especially stringent test governing such requests, which is reason alone to deny its motion.

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). On the other hand, "mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Wetzel*, 635 F.2d at 286; *see also Taylor v. Freeman*, 34 F.3d 266, 270 n. 2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is *disfavored*, and warranted only in the most extraordinary circumstances") (emphasis added). Accordingly, "a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *Microsoft Corp.*, 333 F.3d at 526.

In assessing whether an injunction seeks to change the status quo rather than preserve it, and so is a mandatory injunction, the Court looks to the "last actual, peaceable uncontested status which preceded the pending controversy," *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2nd Cir. 1994). This is judged based on "the reality of the existing status and relationship between the parties." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).

Plaintiff asks the Court to enjoin its 2015 risk adjustment assessment, the agency's collection processes regarding that assessment, and the implementation of the risk adjustment program as to Evergreen for the 2016 and 2017 and "any future" years. *See* Proposed Order, ECF No. 18-2 at 2. This would undeniably change the status quo, *i.e.*, the continued operation of the risk adjustment program (into which Plaintiff already paid for 2014, without objection, Beilenson Decl. ¶ 37) in strict accordance with a detailed governing methodology which, pursuant to the standards promulgated in advance by the Department, included the timelines (among them the June 30 date for risk payments and charges), risk coefficients, transfer formula, and every single other aspect of the risk adjustment program. *See* 45 C.F.R. 153.320. *See also supra* (listing annual risk adjustment rules).

If there were any doubt that Plaintiff seeks to alter the status quo, the Court need look no further than Plaintiff's own statements over the course of the last year as it lobbied Congress and the Department to retroactively exempt it from the risk adjustment program (or cap its payment) for 2015.[1] Testifying to Congress on November 5, 2015, Mr. Beilenson argued that "the risk adjustment formula requires review and revision." Nov. 5, 2015 Beilenson Testimony at 2. Evergreen expanded on this "revision" request in its December 21, 2015 comment on the agency's rulemaking setting forth the methodology for 2017. There, Evergreen asked for an exemption from or cap on its risk adjustment payments, and also made some of the methodology arguments it presents here. *See* Comment of Evergreen Health Cooperative, December 21, 2015. In so doing, Evergreen asked "to have the 2015 RA methodology *reconsidered* based on the items enumerated above." *Id.* at 2 (emphasis added).

---

[1] Plaintiff's briefing in this action also confirm that they seek a change to the status quo, not preservation of the status quo. *See* Pl.'s Mem. at 12 ("Evergreen Health . . . advocate[d] for change in the Government's Risk Adjustment Methodology"); *id.* at 13 ("insurers . . . continued to appeal to CMS to *change* the methodology").

[2] It is notable that Plaintiff attaches to its filings a report from an actuary apparently retained

Evergreen's own actuary also understands that continued operation of the risk adjustment program pursuant to the lawfully-established methodology represents the status quo, and Evergreen's vision of somehow voiding its risk adjustment charge reflects an unrealistic "change" in the status quo.  Evergreen submitted its rate filing for the 2017 plan year to the Maryland Insurance Administration in April 2016.  In that filing, its actuary explained its view that "the most appropriate assumption" for setting Evergreen's rates for the upcoming year "would be to use the [risk adjustment] payment transfer formula as currently stated in federal regulation."  Rate Filing at 10.  Although Evergreen ordered the actuary to assume it would obtain a retroactive "chang[e]" in the formula through its reform efforts, *see id.*, the actuary protested that, because of this problematic assumption, the analysis "*should not be used*" for evaluating Plaintiff's solvency.[2]  *Id.* (emphasis added).  Similarly, Maryland's Insurance Commissioner went before Congress in February 2016, to advocate for "CMS to *review* the formula . . . to make adjustments for 2015 and 2016 . . . and not wait until 2017 or 2018 to *enact reforms*."  Redmer Testimony, ECF No. 18-4  at 2 (emphases added).  He argued specifically that Evergreen's viability was "jeopardized by the adverse and perhaps fatal financial impact caused by . . . the *current risk adjustment* and risk corridor programs."  *Id.* at 1.

The Department's risk adjustment methodology for 2015 was finalized on March 11, 2014.  Now, near the completion of the risk adjustment process for that year, Plaintiff asks the Court to exempt it from that process by court order, going to pains to emphasize a last minute emergency that, if it exists, is the result of Plaintiff's delay in seeking judicial relief.  *See infra,* Part III.A.  Nothing about this request would preserve the status quo; quite the opposite, it would

---

[2] It is notable that Plaintiff attaches to its filings a report from an actuary apparently retained specifically for purposes of Plaintiff's preliminary injunction motion, ECF No. 18-5, but does not include any submission from the actuarial expert who assisted Evergreen with its state filings.

throw a wrench in the operation of the risk adjustment program in the way that everyone (including Evergreen's actuary and Maryland's Insurance Commissioner) expected it to operate since the methodology was promulgated in 2014.  Granting an injunction in these circumstances would have direct impacts for other issuers that depend upon such payments.  Again, to gain such an extraordinary order, Plaintiff must satisfy the test applicable to mandatory injunctions, which asks whether it is "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind."  *Microsoft*, 333 F.3d at 525.  Plaintiff does not even assert that either element of this test is satisfied, nor could it.

To begin, Plaintiff is not in "a deteriorating circumstance created by the defendant," *id.* at 525.  Plaintiff took a calculated risk to lower its premium rates (contrary to the trend among other Maryland insurers)—and expanded quickly as a result.  *See* Sarah Gantz, *Evergreen Health is undercutting Carefirst's Exchange premium prices to gain market share*, Baltimore Business Journal (Aug. 26, 2014).

Moreover, far from creating "deteriorating circumstances," it appears that recent regulatory changes to the status quo have helped improve—not diminished—Evergreen's prospects.  As recently as May 2016, Mr. Beilenson told reporters that if Plaintiff could not find a way out of making its expected $22 million risk adjustment payment for 2015, "we're dead." Sara Hansard, *State Officials: CMS Inflexible on Risk Adjustment Changes* (May 27, 2016) (online at http://www.bna.com/state-officialscms-inflexible-n57982073275/).  Now, Mr. Beilenson declares that Plaintiff is in the process of securing a loan that "will be sufficient to remain as an operating entity," Beilenson Decl. ¶ 57, such that he is "quite confident" that

Plaintiff will survive.   Sarah Gantz, *Evergreen Health Co-op suing federal government over insurance program*, Baltimore Sun (June 13, 2016).

The loans that Mr. Beilenson credits with Evergreen's turnaround were presumably made possible by the recent changes to the CO-OP program that the Department issued by regulation on May 11, 2016, specifically in order to assist CO-OPs like Evergreen.   *Amendments to Special Enrollment Periods and the Consumer Operated and Oriented Plan Program*, 81 Fed. Reg. 29146 (May 11, 2016).   Indeed, these changes in the lending rules governing the CO-OP program were the very first reform requested by Mr. Beilenson when he testified before Congress in November.   Nov. 5, 2015 Beilenson Testimony at 1.   And, as even Mr. Beilenson acknowledges, CMS also recently agreed to restructure Evergreen's CO-OP loan to further bolster the company's solvency.   *Compare* Beilenson Decl. ¶ 57 ("the repayment schedule for the CMS start up loans will also be pushed back five years").   In such a situation "the exigencies of the situation" certainly do not demand a court order requiring the agency to make still more changes, let alone the highly disruptive last-minute alteration to the risk adjustment program that Plaintiff requests.

Furthermore, there is no question whether a mandatory injunction is necessary "to preserve the court's ability to enter ultimate relief on the merits of the same kind."   *Microsoft*, 333 F.3d at 525.   There has been no suggestion that Plaintiff could not obtain full relief if the Court were to rule in its favor after expedited briefing on summary judgment.   And, even in the extreme circumstance in which Plaintiff were to go out of business before this case is resolved on the merits—a scenario that even Plaintiff says will not happen—its creditors would still be able to maintain this challenge to the Department's risk adjustment methodology and seek that very same relief.   That is an independent reason to deny Plaintiff's motion.   *See Microsoft*, 333 F.3d at

525 (separate from failure to demonstrate irreparable harm, plaintiff's failure to show that mandatory injunction was "necessary to the prosecution of its claim in litigation" was "fatal" to motion).

Plaintiff asks the Court to order a mandatory injunction—indeed Plaintiff asks the Court to make a significant change to the risk adjustment program that it failed to obtain from Congress or the Department—but Plaintiff does not even assert that this is one of the rare cases "when the exigencies of the situation demand such relief." *Wetzel*, 635 F.2d at 286; *cf. United Steelworkers of Am., AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 10 (1st Cir. 1987) (injunction requiring insured to resume making insurance premium payments was prohibitory, not mandatory, because status quo was that premiums were being paid). The Court should deny Plaintiff's request.

## II.    PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER IS PROCEDURALLY IMPROPER

In addition to being an impermissible mandatory injunction, Plaintiff's motion for a temporary restraining order is procedurally improper. Under Federal Rule of Civil Procedure 65(b), a TRO expires "after . . . 14 days." But the government's collection processes do not call for issuance of the invoice for payment by September 9 on which Plaintiff's motion focuses until August 10, after the requested TRO would have expired.[3] So a 14-day injunction entered now could not technically address that August 10 invoice.

The Court could *extend* any TRO by an additional 14 days from the date of entry, thereby reaching the August 10 deadline, if it finds "good cause" to do so. Fed. Rule Civ. Pro. 65(b). But Plaintiff's desire that the Court enter a TRO weeks before the action they want to stop is not "good cause" to extend the duration of a TRO from 14 to 28 days. Quite the opposite,

---

[3] The government will "net" a part of the payment when netting occurs on August 9, and that process will be irretrievably set in motion a week prior, by August 3. But Plaintiff's motion for a TRO is focused on the invoice that will issue on August 10 after netting.

compliance with Plaintiff's request that the Court rule on the TRO before it is ripe would increase the risk of error—by depriving the Court of additional time to consider the complicated issues presented by Plaintiff's motion.   There is no need to create that risk of error, especially given recent policy developments that might obviate Evergreen's claimed basis for emergency relief.   On July 15, 2016 (today), HHS announced a policy regarding its netting of subsidy payments from insurers who would otherwise be required to end coverage.   The Department has also contacted the MIA to inform it of the new policy.   *See* Declaration of Jeffrey Wu ¶ 6 n.1 ("Wu Decl.") (Ex. C).   There is now, at a minimum, substantial additional doubt as to whether Evergreen faces the adverse decision from the MIA that it fears (but does not expect).   This Court should defer a decision on emergency relief until more clarity develops.

### III.   PLAINTIFF HAS SATISFIED NONE OF THE ELEMENTS REQUIRED TO GAIN THE EXTRAORDINARY REMEDY OF A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTIVE RELIEF

In any event, even prohibitory preliminary injunctions to preserve the status quo "'are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances.'"   *Microsoft*, 333 F.3d at 524 (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   Although all four of these elements must be satisfied independently, *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013), Plaintiff has met none of them.

### A.  Plaintiff Has Not Demonstrated a Likelihood of Irreparable Harm Absent an Injunction

"The likelihood of irreparable harm to the plaintiff is the first factor to be considered" in considering a motion for preliminary injunction, *Direx Israel, Ltd. v. Breakthrough Medical. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted), because "a clear showing [of] immediate irreparable harm" is a "condition for the grant of a preliminary injunction." *Id.* at 812, 815. This "clear showing" requirement means that merely demonstrating a "possibility" of immediate irreparable harm is insufficient.[4] *Wetzel*, 635 F.2d at 288. Rather, it is Plaintiff's burden to demonstrate "likelihood of actual irreparable injury." *Id.* Furthermore the asserted harm "must be *neither remote nor speculative, but actual and imminent.*" *Microsoft*, 333 F.3d at 530 (quoting *Direx Israel*, 952 F.2d at 812; emphasis added by *Microsoft*).

Plaintiff attempts to carry this burden by noting that its 2015 risk adjustment assessment counts as a liability for purposes of estimating its solvency and by listing various potential adverse consequences that it will "face," Pl.'s Mem. at 41, as a result of its solvency position over the next several months. But Plaintiff fails to carry its burden to show that these solvency-related harms are "actual and imminent," indeed Plaintiff's delay in seeking an injunction while it lobbied Congress and the Department—and then for months after—undermines its claim to irreparable harm. Furthermore, Plaintiff fails to carry its burden to show that any alleged harms are irreparable, and fails to show that a preliminary injunction or TRO would have any impact on the MIA's behavior.

1.      Plaintiff has not established that its alleged harms are actual and imminent and this Court could resolve this matter on the merits promptly

---

[4] Plaintiff's proposed preliminary injunction and temporary restraining orders suggest that Plaintiff need show only a "possibility of irreparable injury." Pl.'s Proposed PI Order at 1, ECF No. 18-2; Pl.'s Proposed TRO Order at 1, ECF No. 19-1. Plaintiff has the standard wrong, as discussed above a "possibility" is not enough; Plaintiff must show a "likelihood." *See Winter*, 555 U.S. at 22 (the "'possibility' standard is too lenient").

Plaintiff does not argue that anything will happen the day after the Court denies its request for a preliminary injunction, or the week after, or even the month after. Instead, Plaintiff argues that its risk adjustment assessment negatively impacts its solvency as reflected in its "risk-based capital" ("RBC") score, and offers a laundry list of negative consequences that it says might flow from its diminished solvency. Plaintiff's showing falls short of demonstrating that any of these alleged harms is actual and imminent.

First, Plaintiff alleges that its diminished solvency is causing it to "face regulatory consequences, including being placed under receivership." Pl.'s Mem. at 42. Plaintiff's opaque language invites questions that its filings do not answer (what does "face" mean? when? how? under what process, and with what warning?). But the Court need look no further than page 43 of Plaintiff's filing to conclude that Plaintiff has not carried its burden to show that injury is "actual and imminent." There, Plaintiff asserts that "Evergreen Health believes it will be able to avoid receivership."[5] *Id.*; *see also* Beilenson Decl. ¶ 60 ("the proposed loan will initially allow Evergreen Health to stay above the required RBC"). Plaintiff cannot ask the Court to enter a preliminary injunction to prevent a consequence that it believes will not happen.[6]

---

[5] Mr. Beilenson's assertion is consistent with contemporaneous news reports, in which he is quoted as saying that despite the risk adjustment assessment "[w]e're quite confident we'll survive." Sarah Gantz, *Evergreen Health Co-op suing federal government over insurance program*, Baltimore Sun (June 13, 2016). It is also consistent with reports providing that the Maryland Insurance Administration had said it did not plan to take action. *See id.* ("Maryland Insurance Commissioner Al Redmer Jr. said he is not worried about Evergreen and does not intend to take action.").

[6] Plaintiff also asserts that an "unexpected event" could push it below the RBC minimum despite the loans, such that it would again "face" receivership (whatever that means). Beilenson Decl. ¶ 60. Again, a possibility of harm that is "unexpected" cannot by definition support preliminary injunctive relief. *See Wetzel*, 635 F.2d at 288 ("possibility" of harm insufficient).

Second, Plaintiff alleges that despite the loans it "will remain at risk of falling below its RBC requirements," and so as a precaution plans to "closely monitor its enrollment," Pl.'s Mem. at 44, and limit new enrollment to an additional 5,000 members in 2017 rather than the additional 13,000-15,000 members Evergreen had hoped to enroll next year.   Beilenson Decl. ¶ 63-64. That capping enrollment, if it happened, would amount to irreparable harm is dubious, but that is irrelevant.  By Plaintiff's own description this purported harm may not happen at all, will happen only as a result of Plaintiff's own precautionary actions (Plaintiff could certainly inform the Court if and when it actually approached the new cap), and will not happen for months.

Third, Plaintiff alleges that it has to raise its proposed premiums for next year "if it is forced to make the risk adjustment payment to CMS on August 15."  Pl.'s Mem. at 46.  (The invoice will actually issue August 10, requiring Plaintiff to remit payment by September 9, pursuant to 45 C.F.R. § 153.610(e).  Wu Decl. ¶ 15.  If this is a harm at all, it is a self-manufactured one; as discussed above and in greater detail below, Plaintiff's initial preliminary rate filings proposed artificially low premiums, contrary to the advice of its own actuary.  In any event, Plaintiff asserts that its rates will be approved "in August or September" and that it will have "little opportunity to subsequently lower the rates."   Pl.'s Opp. at 21; Beilenson Decl. ¶ 69. Plaintiff, however, must make a "clear showing" that it will suffer "actual" and "imminent" injury absent an injunction.  Its admission that it may be able to lower its rates later regardless whether it gets an injunction now precludes such a showing.

Fourth, Plaintiff alleges that the June 30 risk adjustment assessment deprives it of "the funds to fully launch [a] mobile application in 2017," Beilenson Decl. ¶ 66, and also prevents its provider network affiliate from "open[ing] new [primary care offices] in 2017."  *Id.* ¶ 65.  When in 2017 Plaintiff intended to do these things it does not say.  But if self-imposed abandonment of

business development plans pending the outcome of a monetary dispute sufficed to establish irreparable injury, then it would not be true that "a preliminary injunction is not normally available" to avoid monetary injury, *Bethesda Softworks LLC v. Interplay Entertainment Corp.*, 452 F. Appx. 351, 353 (4th Cir. 2011).  Anyone could manufacture such a claim.

That Plaintiff fails to allege actual or imminent harm is itself an independent basis to deny its motions for emergency relief.  *See Direx*, 952 F.2d at 812.  But that conclusion is particularly appropriate because of the quickness with which this matter could be resolved on the merits.  This is an APA case for review of discrete agency action, namely, the Department's 2015 risk adjustment methodology (and the 2014 methodology upon which it built).  Such cases are decided via motions for summary judgment after the administrative record is filed.  *See, e.g.*, *Nieves v. McHugh*, 111 F. Supp. 3d 667, 679-80 (E.D. N.C. 2015) ("in an APA claim, summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review" (internal quotations omitted)).

The Department is willing to accommodate Plaintiff's desire to resolve the case promptly, and so has expedited preparation of the administrative records for its 2014 and 2015 Risk Adjustment rules.  The Department anticipates filing the records by the end of July, two weeks before the answer is due.  The parties could brief summary judgment quickly thereafter, such that this case could expeditiously be presented to the Court for full and final resolution.

2.      Plaintiff's delay undermines its claim of imminent irreparable harm

Plaintiff's showing of actual, imminent irreparable harm is also undermined by its significant delay in seeking preliminary injunctive relief.  *See Eagle On All. v. Jewell*, 2013 WL 618898 (E.D. Va. Nov. 22, 2013) ("dilatory manner" in which plaintiffs pursued legal redress

"undermined" claim of irreparable harm").  Courts have repeatedly held that delay in initiating a preliminary injunction proceeding may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel,* 872 F.2d 75, 80 (4th Cir. 1989) (explaining that when "an application for [a] preliminary injunction is based upon an urgent need for the protection of [a] [p]laintiff's rights, a long delay in seeking relief indicates that speedy action is not required") (internal quotation marks omitted).  Plaintiff filed its preliminary injunction motion on the same day that the Department published its calculations of 2015 risk adjustment payments and assessments. But it is not those calculations that Plaintiff challenges; those calculations are simply a ministerial application of the risk adjustment methodology already in place.  Instead, Plaintiff seeks to enjoin the 2015 risk adjustment methodology two years after that methodology was published; seven months after Plaintiff testified to Congress that it should "revis[e]" the program; six months after Plaintiff made the same argument to the Department; three months after Plaintiff, even by its own admission, came to understand that its payment would be $22 million; seven weeks after HHS issued a rule announcing changes to the CO-OP program that are apparently responsible for Plaintiff's ongoing viability; and three weeks after filing its lawsuit in this action.  If Plaintiff really believed irreparable harm was imminent absent an injunction, then surely it would have come to the Court much sooner.

Indeed, at the time it filed its motion for preliminary injunction, Plaintiff believed that the agency's collection processed would require payment beginning July 15, 2016, with final payment of the full balance to be due August 15, 2016.  Beilenson Decl. ¶ 48.  (In fact, the first partial collection through netting will occur August 9, an invoice will issue August 10, and payment in full will be required within 30 days.  Wu Decl. ¶ 15).  Plaintiff nonetheless waited to

file the motion until it was too late to stop the July 15 partial collection Plaintiff thought would occur, and did not ask for a ruling from the Court before that date. *See* Beilenson Decl. ¶ 48 (asking that Court enjoin August 15 deadline for Evergreen to "write a check to CMS" for balance of its assessment).  That Plaintiff was willing to delay filing until it thought it was too late to stop collection of a portion of its assessment further suggests that Plaintiff itself does not understand any actual, imminent, and irreparable harm to flow from the agency's collection processes.

> 3.     Plaintiff's alleged harms would not support preliminary injunctive relief

Even if Plaintiff had shown that it is facing imminent, actual harm, it still would have failed to show that any such harm is irreparable.  Plaintiff's alleged harms all flow from an underlying purported monetary injury—its risk adjustment assessment—and monetary injury generally fails to meet the requirement of irreparable harm for a preliminary injunction. *E.g. Hughes Network Sys. Inc. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Accordingly, the situations in which monetary injury establishes irreparable harm are extremely narrow. *Id.*  A preliminary injunction is ordinarily appropriate to prevent a monetary injury only if the movant's business cannot survive absent a preliminary injunction, or if the defendant becomes insolvent before final judgment. *Bethesda Softworks*, 452 F. Appx. at 353.  Plaintiff asserts, however, that it will remain in business whether or not the Court grants its requested injunction.  Beilenson Decl. ¶ 60.

Plaintiff attempts nonetheless to establish irreparable harm by focusing on various secondary harms that would allegedly "flow"—due to its actions or the actions of the Maryland Insurance Administration—from its monetary injury, and arguing that those harms would be irreparable.  Pl.'s Mem. at 42-48.  But merely outlining potential opportunity costs of financial

24

injury does not convert monetary injury to irreparable harm.  *See Braintree Labs, Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (rejecting irreparable harm argument premised on opportunity cost of money; "[a]n asserted injury so ubiquitous cannot serve as the basis for the issuance of a preliminary injunction"); *see also id.* (such an assertion would require a substantial evidentiary showing).

      4.      Plaintiff has not demonstrated that a preliminary injunction would prevent its alleged harm

Plaintiff's alleged irreparable harms all flow from the purported effect of the risk adjustment assessment on Plaintiff's solvency and so the likelihood of action by the MIA.  *See supra*.  But Plaintiff has failed entirely to demonstrate that the MIA would assume in assessing Plaintiff's solvency that Plaintiff will never have to pay for risk adjustment just because the Court had delayed by a few weeks or perhaps longer the Department's collection processes.   In fact, all evidence is to the contrary.  Actuarial guidance specifically addressing risk adjustment payments provides for "diligent and conservative" accounting, in which "risk adjustment" liability should be "estimated based on experience to date" and counted as a "premium adjustment[] subject to redetermination."  *See* SSAP 107.  Similarly, Plaintiff's own actuary insisted that Plaintiff should count its *estimated* 2015 risk adjustment assessment in assessing its solvency in its April 2016 rate filing.  *See* Evergreen 2017 Rate Filing.  And the Maryland Insurance Administration itself—the entity, not before the Court, whose theorized actions Plaintiff asks the Court to enter an order to try to forestall—has instructed Plaintiff that its financial filings must count Plaintiff's actual 2015 risk adjustment charge, not to mention Plaintiff's "best estimate of the 2016 risk adjustment assessment" that has accrued so far this year.  MIA July 5, 2016 Email, ECF No. 19-2; June 15, 2016 MIA Letter at 2, ECF No. 18-3

(instructing Evergreen to include in its financial filings "the *actual* amount for 2015 paid in 2016" and "the *projected payment* of the 2016 risk-adjustment amount in 2017").

Indeed, Plaintiff has been counting its estimated 2015 risk adjustment assessment as a liability for months, since long before the assessment was formalized. *See* 2017 Rate Filing. The only reason Plaintiff's RBC score appears—on Plaintiff's version of the facts—to have taken a recent and sudden hit as a result of the assessment is that Plaintiff has been operating based on the completely unsupported assumption that it would succeed in obtaining a retroactive cap to its assessment from Congress or the Department. *See, e.g.*, 2017 Rate Filing.

Plaintiff's filings hint at why it thinks that a TRO or injunction would lower the likelihood of adverse action by the MIA. *See* Pl.'s TRO Mem. at 4 ("A TRO . . . would keep the 2015 risk adjustment liability off of Evergreen Health's books"). If the Court enters an emergency order then Evergreen will apparently return to its head-in-the-sand accounting practice of excluding its risk adjustment assessment *altogether* from its financial filings, in particular, from Plaintiff's "June 30 financials, which will need to be filed with the MIA no later than August 15." Beilenson Decl. ¶ 49 ("Once Evergreen Health books the risk adjustment assessment, that assessment is counted toward its minimum risk-based capital ("RBC") level"). In other words, Evergreen would treat an order from this Court enjoining the risk adjustment program for a few weeks or months as *permanent* for purposes of describing its financial situation to the MIA. What really appears to matter to Plaintiff is not so much the effect of an emergency order on the government's conduct, then, but the effect of an emergency order on Plaintiff's own recordkeeping practices.

The problem with Plaintiff's theory of how emergency relief would help it is that it depends critically on the premise that the MIA would make long-term decisions about Plaintiff's

financial prospects in reliance on a temporary order from the Court focused on the dates of particular steps in the agency's collection processes.   Plaintiffs have offered no reason whatsoever to believe the MIA would do that.   Indeed, even from a lay perspective such an approach presents problematic consequences.   For example, Plaintiff asserts that, in reliance on a *temporary* order from the Court, it would take long-term and difficult-to-reverse solvency-intensive actions—lowering its premiums for 2017, or hiring additional personnel, opening offices, or investing in a costly app.   Beilenson Decl. ¶ 66-69.   But if any such order granting temporary emergency relief were ultimately set aside by an order denying a preliminary injunction, or granting summary judgment to Defendants, or even by an order granting summary judgment to Plaintiffs but not setting aside in full the entirety of Plaintiff's risk adjustment assessment, then interim actions by Plaintiff treating the order as permanent would only have served to exacerbate its financial situation.

Because Plaintiff has not shown that the MIA would assess its financial situation any differently were the Court to enjoin collections or enter other emergency relief for a period of weeks or months, Plaintiff has failed utterly to demonstrate that emergency relief is necessary to prevent irreparable injury.   The uncertainty on this point shows that Plaintiff has failed its burden to prove that a likelihood of irreparable harm, indeed, it fails even to prove that it has standing as its claim that an injunction would be effective depends on speculation about how an order might prompt a third party to alter its behavior.   *See Eagle on All. v. Jewell*, 2014 WL 4444247, *4 (E.D. Va. 2014) ("there is no redressability when, even if the plaintiff were to prevail, a party not before the court would still be free to engage in the offending action").

5.      Plaintiff has not demonstrated that a temporary restraining order would forestall irreparable harm, either

Plaintiff's motion for a preliminary injunction assumes that Plaintiff will obtain solvency loans (enabled by the Department's CO-OP reforms, *see supra*), and argues that irreparable harm will nevertheless flow from the effect of Plaintiff's 2015 risk adjustment assessment on its solvency.  Plaintiff's motion for a temporary restraining order, on the other hand, focuses on the time between August 1 and whenever Plaintiff finalizes those loans (Plaintiff claims August 15, Beilenson Decl. ¶ 57).

Plaintiff alleges that the Maryland Insurance Administration has informed it that it expects Plaintiff to have its loans ready for regulatory approval by August 1, that Plaintiff does not expect to have the loans finalized until between August 5 and August 19, and that there is a "possibility" that the MIA would take an administrative action in the interim.  Pl.'s TRO Mem. at 4; Second Beilenson Decl. ¶ 8.  Accordingly, Plaintiff asks for a temporary restraining order postponing HHS's August 10 invoice that will require it to remit payment by September 9, and also enjoining the already-issued assessment, on the premise that this would cause the MIA to relax its own "deadline."

Plaintiff has failed entirely to show it is likely that the MIA will engage in any harmful action based on Plaintiff's expected failure to make this supposed deadline. Indeed, the email does not even set out August 1 as a deadline, instead it says the Administration "expects that commitments for loans with outside financiers will be converted to surplus notes by August 1, 2016," in order to allow sufficient time for regulatory approval before the presumed risk adjustment August 15th invoice date.  (The invoice will issue August 10, it will seek payment by September 9, pursuant to 45 C.F.R. § 153.610(e).)  There is no mention of administrative consequences to follow from frustration of the MIA's expectation, and certainly no suggestion that the MIA would put Evergreen in receivership for failing to meet the deadline by a week or

two.   That is why the most Plaintiff can bring itself to say is that the email creates the "possibility" of receivership in the absence of a TRO.   But that is, as a matter of law, insufficient. *Winter*, 555 U.S. at 21.

Moreover, even if Plaintiff had demonstrated that administrative action by the MIA were likely and imminent, Plaintiff does not explain why it thinks that postponing the date on which HHS technically sends Plaintiff an invoice requiring Plaintiff to remit the remaining balance, after netting, of its risk adjustment assessment would cause the MIA to alter its behavior.   As discussed *supra*, Plaintiff must count the 2015 assessment (and its estimated 2016 assessment) in describing its financial position whether collection activities have begun or not, and the MIA has indicated that it will assess Plaintiff's solvency based on Plaintiff's actual 2015 risk adjustment payment and estimated 2016 payment.   Plaintiff has offered no reason to believe that the MIA would make significant, long-term solvency decisions in reliance on a temporary order altering the dates of particular steps in the agency's collections processes.   *Cf. Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (to support standing, alleged harm must not be "th[e] result [of] the independent action of some third party not before the court.").

### B.  Plaintiff Has No Likelihood of Succeeding on the Merits

1.      Plaintiff will not avoid its risk adjustment assessment through its methodology challenge

As discussed above, Plaintiff asked Congress and the Department to cap risk adjustment assessments at 3% of premiums or to exempt Plaintiff from the program altogether for several years, *see supra* Part I.   Plaintiff has not obtained such an exemption or cap.   Plaintiff does not argue that the lack of a retroactive exemption or cap is itself arbitrary and capricious, however. Instead, Plaintiff focuses its lawsuit on the original 2014 and 2015 risk adjustment methodology

rules,[7] arguing that the methodology promulgated by the Department is arbitrary and capricious. Plaintiff is wrong.

                a.       The risk adjustment methodology bears a rational connection to enrollee health

The risk adjustment methodology is an eminently reasonable and well-considered approach to an exceptionally complex actuarial challenge. The methodology easily satisfies the deferential standard of review the Court applies in reviewing it.

When asked to review agency action, the Court inquires only whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a deferential standard of review under which the agency's action carries a presumption of regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). The Court must uphold the agency's action so long as the Department "considered the relevant data and articulated an explanation establishing a rational connection between the facts found and the choice made," *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The Court's review extends to and is limited by the record that was before the agency

---

[7] Plaintiff's complaint, request for relief, and motion all focus on the Department's 2015 risk adjustment methodology as promulgated in the Federal Register. *See* Compl. at 25 (seeking injunction of implementation of "the Government's Risk Adjustment Methodology described in 78 Fed. Reg. 15,410 (Mar. 11, 2013) and 79 Fed. Reg. 13,744 (Mar. 11, 2014)"); Pl.'s Mem. at 11 ("In March 2013, *CMS finalized* the methodology that it would use to calculate risk adjustment payments."). At pages 31-32 of its brief, however, Plaintiff complains that the Department has not made *retroactive* changes to that methodology. *See* Pl.'s Mem. at 32 ("There is no rational reason for CMS to decline to apply these corrections to the methodology for 2015 and 2016."). Plaintiff is right not to actually present such a claim; the Department's regulations require a state (or the Department implementing a risk adjustment program on behalf of a state) to promulgate the risk adjustment methodology for a given calendar year well in advance of that calendar year. *See* 45 C.F.R. § 153.320 (advance notice must provide "complete description" of calculation and data collection methodology). And, as plaintiff acknowledges, the agency's authority to change its methodology "retroactively" is limited by *Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988). Plaintiff's desired change to the methodology at this late stage could undermine the predictability that is essential to insurance market stability.

at the time it made its decision, "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Because the Court's review will be limited to the record that was before the agency, Plaintiff's purported expert report will be completely irrelevant to the Court's determination of the merits, as will be Plaintiff's allegations based on data acquired long after the methodology rules it challenges.

Moreover, the Court's deference is heightened here because "[d]eveloping a risk adjustment program is methodologically and operationally complex." 77 Fed. Reg. at 17230. The "traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014); *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential"); *Idaho Wool Growers*, 816 F.3d at 1107 ("When an agency undertakes technical scientific analyses, as with the development of models to help analyze a problem, the court's deference to the agency's judgment is at its peak"). Among other things, the Court "must defer to the agency's decision on how to balance the cost and complexity of a more elaborate model against the oversimplification of a simpler model." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983) ("[w]e can reverse only if the model is so oversimplified that the agency's conclusions from it are unreasonable").

Consistent with this highly deferential review, courts "reject an agency's choice of a scientific model only when the model bears *no rational relationship* to the characteristics of the data to which it is applied." *San-Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 620 (9th Cir. 2014); *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (same);

*see also Miami-Dade Cty v. U.S. EPA*, 529 F.3d 1049, 1070 (11th Cir. 2008) (citing "rational relationship" standard). Courts have noted in applying this "rational relationship" standard of review to agency models that "[t]he existence of a flaw . . . does not require us to hold that the agency's use of the model was arbitrary," *id.; Am. Iron & Steel Inst.*, 115 F.3d at 1005 (same), though the Court need not reach that question here, as no flaw in the model has been proven.

Given this deferential standard of review, Plaintiff will not succeed on the merits of its APA challenge to the methodology. After extensive public meetings, expert panel discussions, and full notice and comment, the Department set forth the complete methodology in painstaking detail in the 2014 and 2015 risk adjustment rules. *See* 78 Fed. Reg. at 15410, 15417-15434 (Mar. 11, 2013) (2014 risk adjustment methodology); 79 Fed. Reg. 13744, 15752-15755 (Mar. 22, 2014) (2015 risk adjustment methodology). It did so with the intent that all participants in HHS operated risk adjustment programs could establish rates and benefits with a comprehensive understanding of how HHS would assess risk and determine charges and payments under the program. The description the agency gave is specific and thorough, down to the last illness, 78 Fed. Reg. at 15426 (providing weighting factors for each metal level of plan for, e.g., diabetes and necrotizing faciitis), and easily passes the "rational relationship" test.

The risk adjustment methodology is "an actuarial tool," 45 C.F.R. § 153.20, used to predict the health of a plan's enrollees, and compare it to the predicted health of enrollees in other plans in order to determine assessments and payments. To greatly simplify, it involves four steps:

*Enrollee health:* First, the methodology needs to determine a particular enrollee's health. The methodology does so by using demographic data (like an enrollee's age, weight, etc.), coupled with diagnostic data, that is, data coded from an enrollee's medical chart that indicate

whether she is diabetic, has asthma, and so on.  78 Fed. Reg. at 15,419.   Only diagnoses that

tend to be good predictors of cost are included in this data collection, but many diagnoses are

tiered to account for the severity of an illness.

*Enrollee cost:* Second, the methodology needs to assess how much extra (or less) it will

cost to insure an enrollee based on his or her sickness (or health).  The methodology does this by

applying a statistical regression algorithm to a sample commercial data set that includes both

enrollee health and actual insurance costs, in order to calibrate weights for each demographic and

diagnosis factor (referred to as "hierarchical condition category" or "HCC") as predictors of

actual healthcare costs.  *See id.* at 15,419-15,420.  This regression produces weights, known as

"coefficients," associated with each such factor.  For example, the coefficient for being a male

aged 21-24 in an ordinary plan is .141.  78 Fed. Reg. at 15,422.  And the coefficient for being

diabetic in such a plan is 2.198.  To determine an enrollee's likely cost, the model adds each

enrollee's coefficients and multiplies them by a base amount that reflects the cost of insuring an

average enrollee.  So a 21-year-old male who has no other health complications gets a score of

.141—the model expects him to cost about 14% of what an average enrollee costs to insure.  And

a 21-year-old male who has diabetes gets a score of 2.339 (2.198 + .141), so the model expects

him to cost about 234% (more than twice as much) as the average enrollee to insure.

*Plan risk score:*  Third, the model must aggregate the risk scores for each enrollee in each

plan in order to determine an overall plan risk score—a prediction of how much healthier (or

sicker) a plan's enrollees are than average and so how much cheaper (or more expensive) they

are to insure.  Aware that there is significant "churn" in insurance markets—enrollees picking up

insurance part-way into the year or dropping insurance in the middle of the year—the

Department designed its methodology to calculate risk scores on a monthly basis for each plan

33

type for each plan within a state.   78 Fed. Reg. at 15431 ("[t]he payment transfer formula provides a per member per month [] transfer amount for a plan within a rating area").

*Comparing plan risk scores:* Fourth, the model must compare each plan within a given state by risk score in order to assign assessment and payments that counter-act the burden of insuring a sicker-than-average population (or the benefit of insuring a healthier-than-average population).   The methodology does this through a complicated "transfer formula" that, at its heart, compares a plan's estimated premium (the premium the insurer would have to charge to cover the health care costs of the healthier-than-average or sicker-than-average enrollees in its plan) to a state-wide average premium (the premium an insurer would have to charge to cover the average health care costs of enrollees in the state).   78 Fed. Reg. at 15431.   For some plans, this comparison yields a risk adjustment assessment, because their estimated premium is lower than the state average.   For others, this comparison yields a risk adjustment payment, because their estimated premium is greater than the state average.

The Department's methodology for estimating and redistributing funds to offset disparities in the health of plans' enrolled populations plainly bears a "rational relationship" to the actual health of plans' enrollees, *Am. Iron & Steel Inst.*, 115 F.3d at 1005, so Plaintiff has no chance of prevailing in its challenge to the methodology on the merits.   Indeed, it does not argue that there is any fundamental problem in the approach laid out above.   Rather, Plaintiff argues that the Department's methodology "fails to account" for three considerations that undermine its accuracy to the point of unlawfulness.   Pl.'s Mem. at 23-29.   Plaintiff is incorrect.

### i. Partial year enrollees

First, Plaintiff argues that the methodology "fails to account for difficulties in identifying HCC diagnoses for partial year enrollees."   Pl.'s Mem. at 23-24.   If an enrollee spends only five

months in a plan, Plaintiffs argue, then it is more likely that he or she will never visit the doctor—and so obtain a diagnosis—even if he or she is nonetheless incurring costs for, say, prescription drugs or physical therapy during that time.  Pl.'s Mem. at 24.

Plaintiff's assertions to the contrary notwithstanding, the Department did consider and account for partial year enrollment in designing its risk adjustment methodology.  *See* 78 Fed. Reg. at 15421 ("Our models were calibrated to account for short-term enrollment in several ways.").  As the Department explained, because plan risk scores are calculated on a weighted monthly basis, the effect of a short-term enrollee on a plan's overall risk score is correspondingly reduced.  (Thus, the risk scores for the 34% of Plaintiff's enrollees who joined in the 12th month of 2015 would be weighed 1/12 as heavily as the scores of full-year enrollees).  The Department also calibrated coefficients to estimate monthly as opposed to annual costs, to avoid any distortion attributable to partial-year enrollees.  *Id.*  In promulgating its methodology, the Department believed that this "statistical strategy" would produce correct estimates for partial-year enrollees.  *Id.*

Plaintiff's complaint is not really that the Department failed to account for partial year enrollment.  Rather, its argument is more particularized and theoretical.  Plaintiff believes that some plans systematically attract more partial-year enrollees than other plans.  If so, then, to the extent of such systemic variation, any inaccuracy associated with partial year enrollment would not cancel out when plans are compared, but instead could disproportionately affect the plans with a greater-than-average proportion of short-term enrollees, assuming such a plan's short-term enrollees are not themselves systemically different than short-term enrollees in other plans.

This argument is based on and largely repeats the Department's own recent analysis, in a white paper published in March 2016, of potential areas of improvement in the methodology for future years.  There the agency stated that, in theory:

> [1] if a plan has an unrepresentative enrollee population by enrollment duration and [2] risk associated with enrollee duration is not fully captured through other aspects of our methodology, then for that plan, partial year enrollment is not accurately accounted for in the HHS risk adjustment methodology.

March 31, 2016, HHS-Operated Risk Adjustment Methodology Meeting 36 (March 24, 2016).

The Department's March 2016 White Paper discussing possible updates to the risk adjustment methodology is not a basis to conclude that the Department erred two years ago when it published its methodology because it did not take into account all possible future refinements. Plaintiff's claim is really that the Department should amend its previously-published rules.  But a "party cannot challenge [an] agency's failure to amend its rule in light of changed circumstances without first seeking relief from the agency" in the form of a petition for rulemaking, which Plaintiff has not sought here.  *Encino Motorcars, LLC v. Navarro*, 2016 WL 3369424, at *6 (U.S. June 20, 2016) (citing *Auer v. Robbins*, 519 U.S. 452, 458–459 (1997)).

### ii. Prescription drug data

Second, Plaintiff faults the methodology for not supplementing the diagnostic data on which it bases risk scores with prescription drug data.  Plaintiff points out that, for example, a diabetic who does not visit the doctor in a given year may not be scored as diabetic using only diagnostic data, but would be if prescription drug data were also included.  Plaintiff here argues that the Department's model—which is already quite detailed—is insufficiently complex.  But the Court "must defer to the agency's decision on how to balance the cost and complexity of a more elaborate model against the oversimplification of a simpler model."  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 535 (D.C. Cir. 1983).

In any event, the Department identified the problem with using prescription drug data in promulgating its risk adjustment methodology: "while use of particular prescription drugs may be useful for predicting expenditures, we believe that inclusion of prescription drug information could create adverse incentives to modify discretionary prescribing."  HHS Notice of Benefit and Payment Parameters for 2014, 77 Fed. Reg. 73118, 73128 (Dec. 7, 2012); *see also* 78 Fed Reg. at 15,419 (Mar. 11, 2013).   The Department's concern, in other words, was that, if an insurer knew it would get paid more the more drugs its doctors prescribed, it might encourage its doctors to prescribe more drugs.  This is an eminently rational concern.

Plaintiff points out that, despite the concern that including prescription drug data could create adverse incentives, the Department is exploring the possibility of supplementing the risk adjustment model for future years with limited categories of prescription drug data.  A key question that the Department will consider in this regard is whether it could design a model that incorporates some drug data without creating the risk of encouraging unnecessary prescriptions. *See* CMS, *Strengthening the Marketplace—Actions to Improve the Risk* Pool (June 8, 2016), *available at* https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/2016-Fact-sheets-items/2016-06-08.html; *see also* White Paper at 41-42 ("Addressing the 'gameability' of risk adjustment models that use drug information requires analysis to determine which drug classes (or individual drugs) are most susceptible, and how to device groupings that strike a reasonable balance between predictive accuracy and reducing 'gameability'").  This simply confirms that the Department is committed, on a continuing basis, to search for ways to refine the risk assessment methodology, while balancing competing considerations in doing so.  But, in the absence of any showing that the Department disregarded a method that was known in 2014 and 2015 to incorporate prescription drug data without encouraging over-prescriptions (HHS has

operated risk adjustment *without* prescription drug data in Medicare Advantage for fifteen years), it cannot be said to have acted arbitrarily in those rulemakings.  *See United States v. L.A. Tucker Truck Lines, Inc*., 344 U.S. 33, 37 (1952) ("[s]imple fairness to those who are engaged in the tasks of administration ... requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice").

### iii. Purported "information advantage" of more sophisticated plans

Third, Plaintiff complains that "the Government's Risk Adjustment Methodology fails to account for the information advantage longstanding health insurance issuers have over new market entrants."  Pl.'s Mem. at 27.  Plaintiff's argument is that longstanding health insurers have more data about their enrollees' past diagnoses, and so are better positioned to choose which enrollees to nag during a plan year to make sure that any relevant diagnoses are reported. For example, Plaintiff contends, a plan might call an enrollee to encourage her to see its primary care doctor in hopes of obtaining diagnoses during the visit, and a plan that knows a particular enrollee was previously diagnosed with diabetes is better positioned to target these efforts. Plaintiff believes this possibility creates systemic bias in favor of larger insurers and that the Department's methodology is arbitrary because it fails to take account of that systemic bias.

Plaintiff's argument offers no basis on which the Department should have concluded that any such effect is large enough, in the aggregate, to warrant treatment in the risk adjustment model.  Although Plaintiff posits that some insurers are better than others at gaming the Department's methodology, it offers no data to support that assertion.  Similarly, Plaintiff offers no reason to believe that the complicated refinement of the model that it proposes—a "credibility adjustment" that would automatically lower bigger insurers' payments on the *assumption* that

they game the system well enough to warrant an adjustment—would be worthwhile.  There are many factors that might influence a plan's ability to code diagnoses other than its size—for example, Plaintiff describes its own "unique" provider relationship where doctors meet for twice as long as usual with new patients during their introductory visit.  Beilenson Decl. ¶ 15 ("providers are [] able to spend approximately twice as much time with patients compared to other primary care offices. . . during their initial appointment, patients at [Evergreen Health Care] spend an entire hour with their primary care provider and health coach, getting both the care they need from the provider and a personalized wellness plan from the health coach, based on the patient's concerns").  This additional time affords a unique opportunity for these doctors to more thoroughly assess and code a patient's condition, which would have the direct effect of increasing Plaintiff's risk scores as compared with the other issuers in their market.

The Department's methodology includes extensive provisions for validating the data submitted by insurers to ensure that reported diagnoses are accurate and supported by the medical record, including validation audits.  *E.g.*, 79 Fed. Reg. 13755-13760 (describing risk adjustment data validation audits).  It was not arbitrary for the Department to decline to speculate further about the relative effectiveness of various insurers' efforts to game the risk adjustment system, or to decline to add a "credibility adjustment" that would have been based on nothing other than guesswork as to the relative success of insurers' potential future efforts to find diagnoses to report.

### iv. Purported distortion in transfer formula

Finally, Plaintiff levies a challenge to the transfer formula that the Department uses to calculate the amount of risk adjustment assessments and payments.  Specifically, Plaintiff complains that the amount of its payment is based on the average plan premium for Maryland,

rather than Evergreen's premium.   Since Evergreen's premium is lower than the average premium, Evergreen contends that this calculation marginally overstates its assessment.   Pl.'s Mem. at 32-33.  It does not.  As the Department explained in its rule in addressing a comment on this precise point, "[t]he goal of the payment transfer formula is, to the extent possible, to promote risk-neutral premiums."  78 Fed. Reg. at 15432.  Basing assessments and payments on the state average premium ensures that for those plans receiving payments, "payments [] help cover excess actuarial risk due to risk selection."  *Id.* at 15430.  As such, the "use of a plan's own premium may cause unintended distortions in transfers."  *Id.* at 15,432.

b. <u>Plaintiff's proposed changes would not save them from a substantial risk adjustment assessment as a result of their healthier-than-average enrollees</u>

"[P]reliminary relief may never be granted that addresses matters which in no circumstances can be dealt with in any final injunction that may be entered."  *Microsoft Corp.*, 333 F.3d at 525 (internal quotations omitted).  Plaintiff asks the Court to do just that.  Even if it were to prevail on its challenge to the Department's risk adjustment methodology, Plaintiff could not gain the permanent injunctive relief that it seeks to bar the risk adjustment assessment altogether.   This further shows that Plaintiff has no likelihood of success that could justify emergency injunctive relief.

It is hornbook law that where a court finds error in an agency action, the proper remedy is to remand to the agency to fix the error, not a Court order precluding the action altogether.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).  Moreover, where it would be disruptive to vacate the agency's action during the remand, the court should keep the agency's action in place while the agency considers the matter afresh.  *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("When equity demands, an unlawfully promulgated regulation can be left

40

in place while the agency provides the proper procedural remedy.").[8]  The injunction (and TRO) that Plaintiff seeks here would be highly disruptive—charges and payments would hang in the balance—so a remand without vacatur would be the appropriate remedy here.  That means that, even if Plaintiff were able to succeed on the merits of its methodological challenge, the ultimate result in this case would likely be to leave its risk adjustment assessment (and payments to other insurers) in place while the agency makes any changes necessitated by the Court's order.

Moreover, even if the agency were somehow to retroactively to make the unwarranted changes to its methodology that Plaintiff requests, Plaintiff would still be unlikely to avoid a substantial risk adjustment assessment.  As even Plaintiff's CEO acknowledges, Plaintiff "ha[s] a healthier than average enrolled population."[9]  Beilenson Testimony at 2; 2017 Risk Adjustment Report at 31.  And the Department has based on the 2014 and 2015 data that it has reviewed regarding its methodology's operation in those years and concluded that the "risk adjustment program [is] working as intended."  June 30, 2016 Risk Adjustment Report at 3, ECF No 18-3.  This data review showed that the "[a]mount of paid claims is strongly correlated with risk scores."  *Id.*

---

[8] Courts in this Circuit have routinely applied this principle to decline to vacate agency decisions pending remand in APA cases.  *See Friends of the Park v. Nat'l Park Serv.*, 2014 WL 6969680, *4 (D. S. C. 2014); *Maryland Native Plant Society v. U.S. Army Corps of Engineers*, 332 F. Supp. 2d 845, 863 (D. Md. 2004); *Dean v. Martinez*, 336 F. Supp. 2d 477, 492 (D. Md. 2004).  So too have the eight Circuit Courts to have addressed the issue.  *See Fertilizer Institute*, 935 F.2d at 1303; *Nat'l Org. of Vets. Advocates v. Sec'y Vets. Aff.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001); *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps. of Eng.*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *Prometheus Radio Project v. FCC*, ___ F.3d ____, 2016 WL 3003675 *14 (3rd Cir. 2016); *Natural Res. Def. Council v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001).

[9] Plaintiff's low reinsurance payment is further indication that it enrolled a healthier-than-average enrollee population, as reinsurance payments go to those insurers with particularly high claims cost.  *See* Wu Decl. ¶ 17.

41

Plaintiff never squarely denies this point, though its purported expert at one point suggests that, if one were to exclusively use prescription drug data, Plaintiff's enrollee population is somewhat less healthy than a "typical under 65" population.  Axene Decl. ¶ 22-23, ECF No. 18-5.   This comparison is flawed from the start because Mr. Axene compared Evergreen's population to a "typical population of under 65" individuals, *id.* n.2, but the relevant comparison is the Maryland small group and individual insurance marketplaces.   Indeed, Mr. Axene concedes that he cannot really say whether (let alone by how much) Plaintiff's risk adjustment assessment is inaccurate because he does not have the "complete statewide information" upon which the assessment is actually based.  *Id.* ¶ 48.

2.      Plaintiff's challenge to the timing of its risk corridor payment does not alter its risk adjustment assessment and belongs in the Court of Federal Claims

Plaintiff also argues that the Department should "offset" Plaintiff's estimated future payments (receipts) under a different ACA program, the risk corridor program, as part of its processes for collecting Plaintiff's risk adjustment assessment.  *See* Pl.'s Mem. at 33-37.   As a preliminary matter, this claim attacks only the Department's *collection* of the risk adjustment assessment and not the amount of the assessment itself, *see* Pl.'s Mem. at 33 ("Separate and apart from problems with how CMS has calculated the risk adjustment, its decision to collect it without offset is also arbitrary, capricious, and contrary to the ACA").  But Plaintiff's alleged harms all flow from the assessment itself, not whatever collection efforts the Department might take.  Accordingly, even if Plaintiff were likely to succeed on its argument that the Department must offset Plaintiff's estimated risk corridor payment in collecting its risk adjustment charge, that would not support Plaintiff's requested injunctive relief as to the risk adjustment program.

In any event, Plaintiff's challenge to the lack of offset of its estimated risk corridor payment will fail, for several reasons.   First, Plaintiff's claim is barred by the doctrine of

sovereign immunity, which is a necessary prerequisite to the exercise of jurisdiction over the United States by any court. *See e.g., United States v. King*, 395 U.S. 1, 4 (1969). Such a waiver "must be unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope," in favor of the United States. *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Plaintiff purports to rely on the APA's waiver of sovereign immunity, but that waiver does not apply to suits for "monetary relief" or where there is another "adequate remedy" at law. 5 U.S.C. § 704. Plaintiffs seek immediate payment of amounts they believe are owed to them by the government, *see* Pl.'s Opp. at 35 (alleging that risk corridors payment must be offset because it is a "mature[] and liquidated debt[]"), which is quintessential monetary relief for which the Court of Federal Claims offers an exclusive, adequate remedy. *See Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) ("to determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act").

"A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory, or mandatory relief *where the thrust of the suit is to obtain money from the United States*." *Christopher Vill., L.P. v. Untied States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) (emphasis added). That is precisely what Plaintiff is trying to do by seeking an injunction ordering offset by an amount it alleges the government owes to it (its estimated risk corridor payment). If Plaintiff believes that the government has not paid all it is obligated to pay under the risk corridors program, then it must file a lawsuit for the alleged balance—or join one of the several such pending lawsuits—in the Court of Federal Claims.

Moreover, even if the Court had jurisdiction over the risk corridor offset claim, that claim would fail because the Department has already offset all risk corridors amounts presently due to

Plaintiff.  Section 1342 of the ACA (42 U.S.C. § 18062) and its implementing regulation, 45 C.F.R. § 153.510, merely establish the risk corridors program and the methodology for calculating payments and charges; they do not require the Department to pay for full risk corridors on an annual cycle, nor do they impose any timing constraints on when the Department must pay risk corridors.  *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.  By declining to specify when payments were due and delegating to the Department the responsibility to "establish and administer" the risk corridors program, 42 U.S.C. § 18062(a), Congress conferred "broad discretion" to the Department "to tailor [the] . . . program to fit both its needs and its budget."  *Contreras v. United States*, 64 Fed. Cl. 583, 599 (2005) *aff'd*, 168 F. App'x 938 (Fed. Cir. 2006).

The Department exercised its discretion by establishing a three-year payment framework for risk corridors.  Under this framework, if risk corridors calculated payments exceed charges for a given benefit year, as they did in fiscal year 2015 (for benefit year 2014), payments are temporarily reduced so as not to exceed the Department's collections of charges for that year.  However, further payments for that benefit year are made in subsequent payment cycles, with final payment not coming due before the end of the final payment cycle in 2017.  *See* Centers for Medicare & Medicaid Services, *Risk Corridors and Budget Neutrality*, April 11, 2014, at 1[10]; Centers for Medicare & Medicaid Services, *Risk Corridors for the 2014 Benefit Year*, November 19, 2015 at 1.[11]  Thus, no additional risk corridors payments are presently due, beyond the 12.6% partial payments that the Department calculated on the basis of its charges collected for 2014.

[10] *Available at* https://www.cms.gov/CCIIO/Resources/Fact-Sheeets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf.

[11]      *Available      at      https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/RC_Obligation_Guidance_11-19-15.pdf.*

Those payments have already been made.  There is no basis for Plaintiff to seek offset of future payments, before they come due, against its present-day assessments from other programs.

Plaintiff also suggests that the risk corridor and risk adjustment programs are so closely intertwined in the ACA that the Department could not lawfully administer one (the risk corridors program) through a three-year framework while administering the other (the risk adjustment program) through an annual framework.  Pl.'s Mem. at 37.  There is simply no textual support for such a claim.  The ACA makes the Department responsible for administering the risk corridor program, 42 U.S.C. § 18062, but gives states the option of administering the risk adjustment program themselves, 42 U.S.C. § 18063.  Only if a state fails, or declines, to administer a risk adjustment program does the statute provide for the Department to do so on the state's behalf. 42 U.S.C. § 18041.  The statute cannot possibly require the two programs to be administered in lockstep, given that it allows for different entities to administer them.  For example, on Plaintiff's theory the State of Massachusetts, which administered its own risk adjustment program in 2014, 2015, and 2016, would be statutorily required to cease any collections under its program until the federal government has made all payments provided for by the risk corridor program.  Nothing in the ACA compels such a strange result.

3.    Plaintiff's challenge to the Department's statutory authority to operate the risk adjustment program in Maryland will fail

Plaintiff also argues that the ACA does not empower the Department to administer the risk adjustment program, focusing on the fact that Section 1343 of the Act says that states are to administer their own risk adjustment program.  Pl.'s Mem. at 38-41.  This is a third non-starter. "Although phrased as a requirement, the Act gives the States 'flexibility' by allowing them to 'elect' whether they want to" operate a risk adjustment program in Section 1321.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *see also* Pl.'s Mem. at 38.  Should a State opt not to

operate its own risk adjustment program, the statute provides that the Department should operate

the program on the State's behalf.  Specifically, it provides that:

> If . . . the Secretary determines . . . that an electing State . . . has not taken the actions the Secretary determines necessary to implement . . . the other requirements set forth in the standards under subsection (a) . . . the Secretary shall . . . take such actions as are necessary to implement such other requirements.

*See* 42 U.S.C. § 18041(b).  The list of "standards under subsection (a) of section 1321" includes,

in turn, "the establishment of the . . . risk adjustment program[.]"  *Id.* § 18041(a).

All parties agree that Maryland did not attempt to implement its own risk adjustment

program.  *See* Compl. ¶ 40 ("Maryland did not develop and obtain certification from the federal

Government for its own risk adjustment model, and thus CMS's methodology applies to

Evergreen Health and other issuers and plans in Maryland.").    So the statutory text

unambiguously authorizes the Department to operate the risk adjustment program in the state.[12]

Moreover, even if the statute were ambiguous Plaintiff would not succeed on this claim

because the Court owes deference to the Department's interpretation of the ACA.  *See Chevron,*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984).  The Department has

explained its view that it may operate a risk adjustment program in any state that does not

operate its own.    77 Fed. Reg. at 17230 ("HHS will administer all of the risk adjustment

functions for any State that elects to establish an Exchange but does not elect to administer risk

adjustment."); *id.* ("Many commenters supported permitting States to defer operation of a risk

adjustment program to HHS."); 78 Fed. Reg. at 15415 ("Our authority to operate risk adjustment

on the State's behalf arises from sections 1321(c)(1) and 1343 of the Affordable Care Act.

---

[12] Plaintiff characterizes the Department's operation of risk adjustment in Maryland as "unilateral federalization."  Pl.'s Mem. at 39.  But as just discussed, the State of Maryland declined to operate its own risk adjustment program; that is the reason the Department stepped in.  This structure is a hallmark of cooperative federalism.

Based on HHS's communications with States, as of February 25, 2013, Massachusetts is the only state electing to operate a risk adjustment program for the 2014 benefit year.").

### C. A Preliminary Injunction or Temporary Restraining Order Would Irreparably Harm Those the ACA Intended Risk Adjustment to Protect and be Contrary to the Public Interest

Even where a Plaintiff makes a "clear showing" of imminent, actual irreparable harm and that it is likely to succeed on the merits, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," *Winter*, 555 U.S. at 24, and also must consider whether the public interest weighs in favor of or against an injunction. *Id.* Because the defendants in this case are the agency and officers responsible for administering the ACA's CO-OP and risk adjustment programs and so "represent[] the public interest," these two considerations merge. *See Jackson v. Leake*, 476 F. Supp. 2d 515 (E.D. N.C. 2008); *Dean v. Leake*, 550 F.Supp.2d 594 (E.D.N.C. 2006).

As discussed above, neither Plaintiff's motion for a preliminary injunction nor its motion for a temporary restraining order is necessary to prevent actual, imminent, irreparable harm to Plaintiff. But even if it were, any such harm would be far outweighed by the corresponding harms an injunction would cause. Emergency relief would cause systemic, irreparable harm nationwide and direct, irreparable harm in Maryland's insurance marketplace.

First, either a preliminary injunction or a temporary restraining order halting the risk adjustment program as to Plaintiff would immediately create uncertainty nationwide about risk adjustment payments. Wu Decl. ¶ 18. The operation of the ACA's insurance markets generally, and the risk adjustment program in particular, depend on timely disbursement of payments and certainty about their disbursement—this is why the Department's regulations require that the program methodology be published months in advance of the plan year, and that assessment and

payment amounts be announced by June 30 following a plan year.  *See* 45 C.F.R. 153.100(b); 45 C.F.R. 153.320; 77 Fed. Reg. at 17231.

If issuers do not have confidence that risk adjustment will timely reimburse them for the risk they take on, they will face strong financial incentives to avoid the sickest enrollees, undermining the protections of the ACA.  Wu Decl. ¶ 18.  This in turn "could potentially caus[e] some issuers to raise their rates to address this uncertainty."  *Id.*  This uncertainty would come at a particularly important time for insurance marketplaces under the ACA, as insurers finalize premiums and sign contracts to commit to offering insurance in the upcoming year.  United Healthcare—the country's largest insurer—has already announced that it is leaving Maryland's Exchange marketplace this year.  *See* Andrea K. McDaniels and Meredith Cohn, *Health insurers seek rate increases in Maryland as United Healthcare quits market* (May 13, 2016), *online at* http://www.baltimoresun.com/_health/bs-hs-rate-increases-20160513-story.html.   An injunction or temporary restraining order would create immediate, irrevocable instability precisely when the marketplaces need stability, and uncertainty about the risk adjustment program precisely when they need certainty.

Second, emergency relief would have direct, adverse consequences in Maryland's insurance marketplaces.  The risk adjustment program is budget neutral, meaning that insurers that enroll sicker-than-average enrollees will not receive offsetting payments until Plaintiff pays its assessment.  *See* March 24, 2016 HHS-Operated Risk Adjustment Methodology Meeting Discussion Paper at 79 ("risk adjustment transfers must meet the requirement of being budget neutral, which means that the payments and charges across an entire risk pool within a market within a State must sum to zero").   For every month Plaintiff's payments are delayed, the likelihood that these plans would permanently increase premiums or take other action would

increase, and Plaintiff alleges that premiums will be finalized next month.  So that means that not only would these other insurers have to go without the funds, but emergency relief might—with a likelihood depending on its duration—cause the sicker-than-average enrollees who enroll in other plans to pay higher premiums throughout 2017.  Furthermore, the urgency of timely payment is increased, not decreased, where an insurer's solvency is in question, because postponing payment—even by a short time—could in the event of actual *insolvency* mean foregoing payment altogether.  Wu Decl. ¶ 19.

Plaintiff makes light of any such increase, arguing that an increase in premiums in other plans that enroll sicker-than-average enrollees would be by a small percentage of premiums for CareFirst or the other big insurers in the state.  But that would just mean that many, many more people could see their insurance rates go up as a result of Plaintiff's requested injunction than would see them go down.[13]  And, such an increase would be directly contrary to the purposes of the risk adjustment program, which is intended to prevent insurers from charging a lower

---

[13] Furthermore, for 2016, Evergreen's plan is the "benchmark" plan in Montgomery and Prince George's counties, which means that it is the second-lowest-cost "silver" plan (plans are assigned "metal" levels based on their cost-sharing generosity) and so forms the basis for calculating the premium tax credit that subsidizes the purchase of insurance for many individuals.  *See* MHBE Implementation Advisory Committee Presentations at 35, September 17, 2015, *online at* http://www.marylandhbe.com/wp-content/uploads/2015/09/EIAC-Final-slide-deck-2015-09-17.pdf.  That may well be the case again for 2017.  The full impact of any increase in such a benchmark plan's premiums is not felt by the many insureds who receive premium tax credits, because the premium tax credit rises along with the premium amount.  *See* 26 U.S.C. § 36B(b)(2)(B)(i).  By contrast, an increase in a more-expensive plan's premiums would be fully internalized by the plan's customers, because the premium tax credit is capped at the level necessary to cover premiums in a rating area's second-lowest-cost silver plan.  *Id.*  This also means that, if Plaintiff were the 2017 benchmark plan and based on a temporary order from the Court Plaintiff were to lower the premiums it charges its healthier-than-average enrollees, Evergreen might inadvertently thereby *lower* the amount of the federal premium tax credit subsidy for all its recipients, even the sicker-than-average enrollees who for whatever reason avoid Evergreen's plans.  This would frustrate the ACA's purpose of ensuring that everyone can afford adequate insurance—regardless of health status—by tying the amount of the premium tax credit subsidy to the second-lowest cost silver plan in a rating area.

premium just because they attract healthier-than-average enrollees.  *See* 78 Fed. Reg. at 15417 (premise of risk adjustment is that "premiums should reflect the differences in plan benefits and plan efficiency, not the health status of the enrolled population.").

The paramount interest in timely payment of risk adjustment charges is shown in the Department's administrative appeal regulation, by which insurers may challenge the amount of risk adjustment assessments.  Given the need for timely payment, the regulation requires an insurer who believes its risk adjustment assessment came in error to make payment while its administrative appeal is pending.  *See* 45 C.F.R. § 156.2220 (if plan ultimately prevails on appeal, disputed assessment is returned to plan).

Thus, Plaintiff's motions should be denied for the additional reason that the relief requested is contrary to the public interest.

## CONCLUSION

The Court should deny Plaintiff's motions for emergency relief.

Dated: July 15, 2016                    Respectfully submitted,


BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ROD J. ROSENSTEIN
United States Attorney

JOEL McELVAIN
Assistant Branch Director
Federal Programs Branch

*/s/ Matthew J.B. Lawrence*
MATTHEW J.B. Lawrence
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.

50

Rm. 6132
Washington, D.C. 20530
Telephone: (202) 616-8105
Telefacsimile: (202) 616-8460
Matthew.Lawrence@usdoj.gov

Attorneys for Defendant

<u>Certificate of Service</u>

I hereby certify that on the 15th day of July, 2016, I caused the forgoing to be served on counsel for plaintiff by filing with the court's electronic case filing system.


<u>*/s/ Matthew J.B. Lawrence*</u>

Matthew J.B. Lawrence